Aliaga v State of New York (2024 NY Slip Op 51694(U))

[*1]

Aliaga v State of New York

2024 NY Slip Op 51694(U)

Decided on December 2, 2024

Court Of Claims

Brindisi, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 2, 2024
Court of Claims

Matthew Aliaga, 
 et al Claimant(s)

against
The State of New York, Defendant(s)

Claim No. 129001

Claimant's attorney:
Sivin, Miller & Roche, LLP
By: Glenn Miller, Esq. and Edward Sivin, Esq.
Defendant's attorney:
Hon. Letitia James, Attorney General of the State of New York
By: Aaron J. Marcus, Esq., Assistant Attorney General and
Douglas Squire, Esq., Assistant Attorney General

Anthony Brindisi, J.

The underlying claim, filed in the Office of the Clerk of the Court of Claims on December 28, 2016, alleges that on July 6, 2016, at approximately 8:00 a.m., correction officers (COs) stormed housing unit 4H at Mid-State Correctional Facility (CF), assaulting thirty-two incarcerated individuals, the claimants in this matter, as well as intentionally destroying their personal property. During the raid,[FN1]
it is undisputed that approximately 30 COs, along with several supervisors, entered the housing unit to locate a weapon allegedly used by incarcerated individuals three days earlier to assault a 4H housing officer, Officer Kahl. Claimants allege that officers, acting within the scope of their employment and under direct supervision, used excessive force on each claimant, resulting in personal injuries. Further allegations include that [*2]claimants were ordered to strip down to their underwear, drag their mattresses through a magnetometer, and provide urine samples following the incident. Three claimants, J.D., R.B. and N.F., additionally allege they were assaulted and battered, with the excessive force involving inappropriate contact with their genital or rectal anatomy. Claimants contend they were subsequently denied medical treatment for any injuries and were threatened with further harm if they attempted to report the incident. Following the raid, an extensive investigation was conducted by the Department of Corrections and Community Supervision (DOCCS) Office of Special Investigations (OSI), resulting in disciplinary actions against several officers and supervisors for their conduct on July 6, 2016. The claim alleges intentional and unintentional torts including negligence, recklessness, assault and battery, destruction of personal property, intentional infliction of emotional distress, deliberate denial of medical care and treatment, verbal and physical threats, harassment, intimidation, failure to intervene and negligent hiring, training and retention by DOCCS employees.
By Stipulation and Order of the Court dated December 5, 2018, this claim and claim number 130596 were consolidated for all purposes, to proceed under the single caption Matthew Aliaga, et al v. The State of New York, under claim number 129001.
Previously, defendant brought a motion to dismiss, or in the alternative, moved for partial summary judgment. Claimants then made a cross-motion for partial summary judgment for the causes of action for assault and battery and intentional destruction of personal property. In his Decision and Order, Judge Collins dismissed the cause of action for intentional infliction of emotional distress, and also stated "to the extent the causes of action asserted by these claimants are premised upon sexual assaults, they are dismissed" (Aliaga v State of New York, UID No. 2021-015-101 [Ct Cl, Collins, J., Nov. 8, 2021] ("Collins Decision"). Otherwise, the motions were denied. The Collins Decision will be further discussed later in this decision.
This claim was transferred from Judge Collins to Judge McCarthy by Transfer Order dated January 10, 2022. It was later transferred from Judge McCarthy to the undersigned, Judge Brindisi, by Transfer Order dated June 27, 2022.
The Court granted claimants' counsel's motion to substitute the Administrator V.G. for deceased claimant R.B., without objection from defendant (Aliaga v State of New York, UID No. 2023-065-013 [Ct Cl, Brindisi, J., June 15, 2023]).
A liability trial was conducted over eleven days at the Court of Claims in Utica, New York on June 26, 27, 28, 29 and 30, July 5 and 6, August 24, 25, 28 and 29, 2023.[FN2]
Over the course of the trial claimants called 30 witnesses and defendant called 12 witnesses. The witnesses testified in a hybrid format, with some testifying in-person and some virtually, by stipulation of the parties. During the course of the trial, claimants marked 91 exhibits for identification, of those exhibits, the following 67 were admitted into evidence: 1-3, 5-8, 10-11, 13-31, 33-34, 36, 38-39, 41, 43-44, 46, 48-50, 52-54, 58-64, 66-72, 75, 78, 82, 84-89, and 5-A. Exhibit 4 was withdrawn (T1-38). Exhibit 88 was admitted, with redactions, under a sealing Order, to be available only to witness Donald Oliver, the Court and counsel, as well as upon any Appellate review, due to its sensitive nature related to DOCCS security concerns (T1-29-30; T3-852). Defendant marked 106 exhibits for identification, of those exhibits, the following 41 were admitted into evidence: H, RR, WW, EEE, NNN, OOO, PPP, QQQ, RRR, SSS, TTT, VVV, WWW, XXX, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, FFFF, GGGG, HHHH, IIII, JJJJ, KKKK, LLLL, MMMM, NNNN, OOOO, PPPP, QQQQ, TTTT, UUUU, VVVV, YYYY, ZZZZ, AAAAA and BBBBB. Exhibit M was admitted, but only as to pages 21-24 (T1-533).
At the commencement of the trial, claimants' counsel made a motion to sever the claim of [*3]George Hogan pursuant to CPLR 603 (T1-7-8). Mr. Hogan is deceased, and no estate or representative of an estate had been appointed as of June 26, 2024 (id.). Without objection from defendant, the Court granted claimants' motion to sever the claim of George Hogan from claim number 129001 (T1-8-9).
Additionally, the claim of Lorenzo Romaine, who was named in both claim number 129001 and claim number 130596, was discontinued by stipulation of counsel due to Mr. Romaine not being present during the alleged incident (T1-9).
At the close of claimants' case on August 25, 2023, claimants made an oral motion to sever the claims of Stacy Wynne, Dean Wainwright and Frank Gillard (T3-216). Claimants' counsel had been unable to locate these three claimants at the time of trial, and defense counsel had no objection to the requested severance. Therefore, the Court granted claimants' motion to sever the claims of Stacy Wynne, Dean Wainwright and Frank Gillard (T3-218).
Also, at the close of claimants' case, defendant made a motion to dismiss for failure to prosecute for the claimants that were severed by claimants' prior motions, as well as failure to make a prima facie case regarding the cause of action for property destruction due to the failure of claimants to show exhaustion of administrative remedies, as well as failure to make a prima facie case regarding any alleged personal injury causes of action (T3-219). Claimants opposed the motion, and the Court reserved its decision (T3-220).
At the close of proof, defendant renewed its motion to dismiss the claim, and claimants made a motion for a directed verdict on the issue of scope of employment (T3-860-861). More specifically, claimants argue that orders to frisk the dorm came from the top, and was within the scope of employment, therefore any intentional act committed during the frisk would be within the scope of employment (T3-863). Defendant opposed claimants' motion arguing that any gratuitous beatings or sexual acts were outside the scope of employment (T3-862). The Court again reserved as to defendant's renewed motion to dismiss, as well as claimants' motion for a directed verdict on the issue of scope of employment (T3-864-865). After the trial, the Court permitted the submission of post-trial memoranda. Oral arguments were held on September 16, 2024 to allow counsel to reply.
RELEVANT TESTIMONY
DONALD OLIVER
Mr. Oliver, now retired from DOCCS, testified that his last position was Deputy Chief Investigator, overseeing all internal affairs investigations statewide for the OSI. He began his career with DOCCS as a CO before becoming an investigator with OSI (T1-42). Mr. Oliver explained that the OSI is responsible for oversight of DOCCS and investigating allegations of misconduct involving both incarcerated individuals and department employees (T1-41-42). Mr. Oliver authored what would later be recognized as the OSI Final Investigative Report on the July 6, 2016 incident (T1-55; Exhibit 1).
Mr. Oliver provided an overview of Mid-State CF, describing it as a medium-security CF with a large special housing unit and a significant Office of Mental Health population. The facility also runs a drug and alcohol treatment program (T1-58). Regarding Mid-State CF, Mr. Oliver testified that the 4H dorm, where the incident occurred, resembles a large college dormitory, with an officer assigned to it during every tour (T1-60). He explained that a "tour" refers to an officer's work shift, and there are three tours per day: tour one runs from 11:00 p.m. to 7:00 a.m., tour two from 7:00 a.m. to 3:00 p.m., and tour three from 3:00 p.m. to 11:00 p.m. (T1-60).
Mr. Oliver described the layout of the 4H dorm, which includes an officer's station known as the "bubble" and a large dayroom. Attached to the dayroom is an outdoor porch surrounded by fencing. Unless specific instructions are given, incarcerated individuals are allowed to move freely throughout the dorm, including the areas mentioned. Mr. Oliver identified Exhibit 88 as a [*4]schematic showing the layout of the 4H dorm as it appeared on July 6, 2016 (T1-62-63).[FN3]

Mr. Oliver provided some background about an incident on July 3, 2016 that preceeded the raid at Mid-State CF on July 6, 2016. Although he was not directly assigned to investigate the July 3 incident, other OSI staff members were involved and explained why OSI was notified (T1-45). He testified that the July 3 incident involved an officer assigned to the 4H dorm at Mid-State CF, Officer Kahl, who was found laying on the floor unconscious with a head injury and blood on the floor (T1-46). Officer Kahl was discovered by incarcerated individuals residing in 4H, who then pulled the officer's pin to summon help, and staff promptly arrived (id.). Officer Kahl was the 4H dorm officer on duty during tour 3 on July 3, 2016.
Mr. Oliver testified that when Officer Kahl was injured, several incarcerated individuals banged on the windows of the dorm housing unit's porch to alert other officers (T1-250). After receiving no response, at least two or three individuals entered the bubble and pulled Officer Kahl's pin (T1-253-254). The pin is a button on an officer's two-way radio that serves as a personal alarm to alert a response team.
Mr. Oliver testified that finding an officer unconscious with a head injury is an unusual occurrence within a CF (T1-46). Mr. Oliver testified that, due to the nature of the July 3 incident, Mid-State's Crisis Intervention Unit (CIU) notified the DOCCS Command Center in Albany, which then informed OSI. He explained that every CF has its own CIU team. A criminal investigation into the July 3 incident was initiated which focused on several incarcerated individuals housed in 4H, and the State Police were notified. Mr. Oliver further testified that no one was ever prosecuted in connection with the July 3 incident. He also noted that Mid-State's CIU conducted a parallel investigation alongside OSI regarding the July 3 incident (T1-46-47).
Mr. Oliver testified that a false narrative spread among the staff at Mid-State CF about the July 3 incident. They believed that Officer Kahl had been assaulted by incarcerated individuals in 4H on July 3. As a result, they thought the raid on 4H conducted on July 6, 2016 was intended to find a weapon allegedly used to assault Officer Kahl and assert authority over the incarcerated individuals, showing them "who's really in charge" (T1-174-175). Mr. Oliver testified that the OSI investigation into the July 3 incident revealed that Officer Kahl had not been assaulted but had, in fact, fallen (T1-166). All misbehavior reports for the individuals alleged to have been involved were expunged (id.).
Mr. Oliver provided further details about the relationship between the Mid-State CIU team and OSI in the days leading up to the July 6 raid. He testified that, during the night of July 3 into the early morning hours of July 4, the Mid-State CIU conducted interviews with various incarcerated individuals housed in the 4H dorm. Mr. Oliver stated that OSI subsequently assumed the lead role in the investigation from the CIU team, which the CIU members did not appreciate (T1-47-48). He testified that, in a criminal investigation, it is problematic to have multiple investigators interviewing suspects or witnesses in different ways, as this could lead to intimidation. He emphasized that investigators should avoid influencing the responses given by individuals. According to Mr. Oliver, OSI believed that the investigation being conducted by CIU members appeared to be attempting to fit a specific "narrative into a certain hole" related to the July 3 incident (T1-48). He also noted that all CIU personnel who conducted interviews related to the July 3 incident were assigned to Mid-State (T1-47-49). Mr. Oliver became more involved in the investigation of the July 3 incident before the subsequent raid at Mid-State on July 6.
Mr. Oliver testified that the raid on July 6 occurred around 8:00 a.m., during tour 2, while the incident on July 3 took place at approximately 5:00 p.m. Mr. Oliver marked several areas on the 4H dorm schematic to indicate the locations of the officer's bubble, dayroom, bathroom, laundry room, and closet (Exhibit 88). Mr. Oliver discussed the layout of 4H and used Exhibits 5 and 5A to identify each incarcerated individual's assigned bed, detailing which bed each [*5]individual occupied (T1-64-78).
Mr. Oliver testified that the hierarchy at Mid-State CF included Superintendent Joseph Ward, Deputy Superintendent of Security (DSS) Joe Corey, and Deputy Superintendent of Programs (DSP) Ann Joslyn (T1-147). During his investigation into the July 6 raid, he conducted what would be referred to as a Q&A session with each of these individuals (T1-148). Mr. Oliver stated that supervising officers and staff at Mid-State CF were compelled to participate in these Q&A sessions, which he conducted himself (T1-150). He interviewed DSS Corey on October 18, 2016 (T1-151-152; Exhibit 10) and later conducted a follow-up interview with him to clarify certain matters (id.; Exhibit 11). Mr. Oliver also prepared a PowerPoint summary slide of his investigation to facilitate briefing DOCCS administration in Albany (T1-153; Exhibit 13).
Mr. Oliver testified that, following his investigation, DSS Corey was disciplined (T1-154). DSS Corey was the highest-ranking security supervisor. When asked about the reasoning for this disciplinary action, Mr. Oliver explained:
So there was a lot of stuff that had gone on and him being the highest ranking security supervisor and some of the decisions that were made that was during the frisk, that things were done incorrectly, inappropriately, that there was a lieutenant and a sergeant that oversaw it, and him being the highranking supervisor he should have made sure that things were done differently, and even during the frisk, he never walked down back, so he never actually saw the carnage that was back there. So for that reason he was disciplined. The higher ups decided to do that.
(T1-154-155).
Mr. Oliver testified that Lieutenant (Lt.) Hebble and Sergeant (Sgt.) O'Neil were responsible for overseeing the raid on July 6, 2016. As part of his investigation, Mr. Oliver also interviewed DSP Joslyn (Exhibit 14). He testified that DSP Joslyn was "really alarmed" by what she observed following the July 6 raid (T1-157). In her Q&A, DSP Joslyn described the search as an "angry search" (id.; Exhibit 14). Mr. Oliver understood the term "angry search" to indicate that this was not a standard search, as "stuff was just thrown everywhere" and "there was a bunch of damage" to State property. He further understood it to suggest that "somebody was upset about something" (T1-158).
Mr. Oliver was asked whether DSP Joslyn had explained why people were so upset, based on his interviews with her. He testified: "I think when she says there's a brotherhood, and I think they wanted to send a message that you hurt one of ours, maybe that's what she was referring to" (T1-159). Mr. Oliver further testified that he did not know to whom they were sending this message, as the incarcerated individuals who allegedly assaulted Officer Kahl on July 3 had already been moved off the unit by that time. He also stated that DSP Joslyn was disciplined for "Failure to take action" (id.). When asked what actions she had failed to take, Mr. Oliver responded: "She should have stopped. She should have taken pictures. She should have made sure that everybody was seen by medical that day" (id.).
Mr. Oliver testified that he conducted a Q&A session with Superintendent Ward as part of his investigation and prepared a summary slide (Exhibits 16, 17). Unlike DSS Corey, Superintendent Ward walked the entire dorm from one end of the housing area to the other after the July 6, 2016 raid (T1-160-161). Mr. Oliver testified that Superintendent Ward thought the officers conducting the raid "went a little bit over the top" (T1-161). As part of his investigation, Mr. Oliver learned that, during Superintendent Ward's walkthrough, he observed a chair with all four legs embedded in the wall of one of the housing rooms (T1-162). Mr. Oliver also testified that Superintendent Ward discovered that the lines had been cut on the TV and the telephones (T1-165). Mr. Oliver also testified that Superintendent Ward was never disciplined for the July 6 incident because he resigned (T1-167).
Mr. Oliver conducted both an initial interview and a follow-up interview with Captain (Capt.) Adamik, one of the two captains at Mid-State and prepared a summary slide for Capt. Adamik's interview (Exhibits 19, 20, 22). He testified that Capt. Adamik was more involved in requesting the raid on July 6, 2016 (T1-169). According to Mr. Oliver's investigation, Capt. [*6]Adamik saw the chair stuck in the wall. Mr. Oliver testified that the raid was not a typical search, as "stuff was thrown on the floor" rather than simply being dumped on top of the bed. Based on his investigation, Mr. Oliver found that the officers conducting the search were given some leeway by the supervisors (T1-170). Mr. Oliver also testified that Capt. Adamik indicated in his statement that the Superintendent was satisfied with what he saw when he inspected the dorm (id.). Mr. Oliver also testified that Capt. Adamik received a notice of discipline regarding this incident.
Mr. Oliver conducted both an initial and a follow-up interview with Lt. Hebble at Mid-State CF (Exhibits 23, 24) and prepared a summary slide for Lt. Hebble's interview (Exhibit 25). What stood out to Mr. Oliver from these interviews was that, despite being the highest-ranking supervisor during the dorm search, Lt. Hebble was not among the first to enter the housing unit (T1-172). Lt. Hebble explained that he was one of the last to enter because he was carrying the magnetometer (id.). Mr. Oliver testified that Lt. Hebble was supposed to be supervising, but "you can't supervise if you are not there" (T1-173). Lt. Hebble also stated that he believed Officer Kahl had been assaulted by incarcerated individuals a few days earlier (id.).
Mr. Oliver conducted an initial and a follow-up interview with Sgt. O'Neil concerning the July 6, 2016 raid (Exhibits 26, 27). Sgt. O'Neil was disciplined for "Failure to supervise" in connection with this incident (T1-177). Mr. Oliver also noted that Sgt. O'Neil's son, Officer O'Neil, was involved in the raid (T1-178). He testified that, unfortunately, there is no nepotism clause prohibiting a supervisor's son from being part of security in an operation like this (T1-178). Mr. Oliver also interviewed Capt. Goppert, and the only statement she made that was relevant to his investigation was that she laughed when she saw the chair in the wall (T1-182). Capt. Goppert was also disciplined for "Failure to supervise" (id.). Additionally, Officers Hayes, Scholl, and Shortt were disciplined for providing false information (id.).
Mr. Oliver testified that his office did not become involved in the investigation of the July 6, 2016 raid until approximately 30 days after the incident (T1-185). As part of his investigation, he was able to identify 31 officers involved in the July 6 raid, though not all were recorded in the logbook (T1-189). Mr. Oliver testified that he believed some, if not all, of the officers who participated in the raid either covered or removed their nametags to avoid being identified (T1-190). According to his investigation, none of the officers admitted to using force against any incarcerated individual (T1-194). Mr. Oliver testified that he was unable to substantiate any claims of use of force (T1-195). He stated, "what we believe and what we could prove are two different things" (T1-199).
Mr. Oliver also testified that, based on the totality of the evidence, both the staff and the incarcerated individuals were less than truthful. He testified that he did not have an opportunity to speak with any of the incarcerated individuals involved in the July 6 incident until over a month after it occurred (T1-198). Mr. Oliver added that speaking with the incarcerated individuals on July 6, 2016 would have been more helpful to his investigation. He also added that being able to photograph every individual to document injuries and perform body checks sooner would have been helpful too (id.).
Mr. Oliver testified about a series of interviews conducted with incarcerated individuals as part of the investigation, which took place on or about August 11, 2016 (T1-238). Although he did not personally conduct any of these interviews related to the July 6, 2016 incident, they were conducted by additional investigators from another OSI office (T1-239). The Court later clarified with Mr. Oliver that a team of individuals assisted him in the investigation. Mr. Oliver confirmed that approximately seven or eight other investigators conducted interviews or collected documents. He did multiple interviews after the fact to follow up (T1-240). However, he personally reviewed all documents and made the final conclusions and recommendations (T1-344).
Mr. Oliver did recall speaking with claimant Israel Miranda, who alleged that he had been kicked, punched, and assaulted during the raid, resulting in an injury to his right rib area (T1-241, see Exhibit 1, p. 4). Mr. Oliver further testified that he contacted the Superintendent, advising [*7]that Mr. Miranda should receive x-rays. It was later determined that Mr. Miranda had fractures in his left ribs, though Mr. Oliver believed Mr. Miranda had complained of right-sided rib pain, but acknowledged he could be mistaken (id.).
Mr. Oliver was asked about a series of photographs taken as part of his investigation (Exhibit 6). He described several photos showing the damage to the 4H dorm resulting from the July 6 incident. Mr. Oliver testified that the wires of the dorm's phone booth had been cut or ripped out of the wall (T1-248-249; Exhibit 6, p. 4-10). However, he could not determine who was responsible, as all staff members denied pulling the cords (id.). Additionally, the cord for the dorm's TV had also been pulled or cut from the wall (T1-248; Exhibit 6, p. 5-7).
Mr. Oliver testified that each incarcerated individual in the dorm is issued a cot, a locker, and a chair, with each chair having four metal legs. During his investigation, he observed several holes in the dorm walls consistent with damage caused by metal chairs. He testified that the holes depicted in the photographs were caused by someone throwing a chair into the wall. According to his investigation, the incarcerated individuals reported that staff had damaged the walls by throwing chairs during the raid. This account was consistent with what Capt. Goppert told him - that she observed a chair stuck in the wall after the raid. Based on his investigation, he concluded the holes in the walls were made by the legs of the metal chairs thrown into the walls (T1-261-263; Exhibit 6, p. 33-38, 71-73). Additionally, none of the officers admitted to causing or witnessing the holes in the wall being made (T1-268).
Mr. Oliver testified that several incarcerated individuals stated during interviews that staff had forced them to lie prone on the ground and emptied the contents of their lockers, scattering personal items such as jelly, peanut butter, tuna, coffee creamer, and oil. Based on the information he gathered, the incarcerated individuals were also ordered to clean the dorm after the frisk took place (T1-265).
Mr. Oliver testified that claimant Kyle Finch reported that staff used a fire extinguisher to break locker locks, as they lacked keys. Some incarcerated individuals also alleged that staff used water fire extinguishers on them while they were lying on the ground. Mr. Oliver testified he investigated by searching for the missing fire extinguishers, eventually finding them hidden in another building's fire and safety area. He testified that although obtaining fingerprints was unlikely, he took the extinguishers, observing that the damage to the bottom was consistent with smashing locks. Mr. Oliver explained the proper procedure for accessing an incarcerated individual's locker at Mid-State. He testified that locks must be purchased from the facility, and supervisors have keys to these locks. If an individual has a lock from another facility, they are required to provide the combination, which should be documented. If no key or combination is available, staff are authorized to cut the lock (T1-282-284; Exhibit 7).
On cross-examination, Mr. Oliver confirmed that he drafted the investigative report, which focused on allegations of staff physically assaulting incarcerated individuals in the 4H dorm and causing property damage. He found no evidence of excessive use of force. Mr. Oliver testified that the investigation relied on the preponderance of evidence standard, taking into account information from both staff and incarcerated individuals, as well as corroborating evidence. Mr. Oliver stated that much of the testimony from incarcerated individuals was embellished, and staff were also less than truthful. He testified the investigation focused on significant injuries, such as broken bones or corroborated injuries, as there was no physical evidence to substantiate minor claims after the fact (T1-331-334).
Mr. Oliver was asked specifically if the testimony he received from the incarcerated individuals was untruthful and gave the following answer:
I don't know if you characterize it that way. I'll say, we had a lot of less than truthful information, people embellishing on certain things. Again, we took what people said, and we believe everything that everybody tells us until we can prove it otherwise or if there's other information that goes against that. The same thing with staff. We're going to listen to what staff have to say, and they were less than truthful. So I think the truth was somewhere in the middle. Again, use all the evidence, you can't say that there's all these [*8]holes in the wall and nobody knew how the holes got there, right, so.
(T1-332-333).
Mr. Oliver testified that his review of medical records revealed conflicting evidence regarding incarcerated individuals' claims. While some individuals alleged they were not allowed to see medical staff, records indicated otherwise. Mr. Oliver referenced sign-in sheets and medical slips that contradicted testimony from the incarcerated individuals, such as that of claimant Kelly, who claimed he wasn't allowed to go to medical but was recorded as having done so. Based on this evidence, Mr. Oliver concluded that medical was indeed available to the incarcerated individuals of the 4H dorm (T1-334-335).
Mr. Oliver testified the State Police also conducted an investigation, concluding that it was impossible to determine the validity of the allegations due to a lack of physical evidence. Mr. Oliver acknowledged that since the investigation took place a month after the incident, there were no visible injuries to corroborate the claims. Specifically, regarding the State Police investigation, Mr. Oliver testified as follows:
So they found that the solvability of the allegations that there was no way to do that. Again, you're looking at, I think we had 30 some [incarcerated individuals] that were on the housing unit. Most of them had said I was punched, kicked, whatever it may be, so you're looking at that again. If you don't have any physical evidence, there's no photographs of the day, it's a month later. You can't necessarily say, somebody could be punched, and you could have a red mark, but that red mark is not going to be there a month later. Right, so we can't say that it happened or that it didn't happen.
(T1-335).
Mr. Oliver testified that, based on other circumstances, he believed that staff did pour coffee, creamer, and other items on the claimants during the incident (T1-336). Mr. Oliver added that staff would have instructed the claimants to keep their heads down, preventing them from witnessing events directly. He considered this factor when evaluating what took place during the July 6, 2016 incident (T1-338).
When asked additional questions regarding the July 3 incident involving Officer Kahl, Mr. Oliver testified that around July 5, 2016 conflicting information began to surface about that incident, prompting a re-interview of several incarcerated individuals. The new information indicated discrepancies in the narrative presented by CIU that Officer Kahl was assaulted. Mr. Oliver testified that the State Police were involved, and at Albany's request, polygraphs were conducted on all incarcerated individuals that were there. Mr. Oliver testified that the results of the polygraphs indicated that the incarcerated individuals were telling the truth. They had not assaulted Officer Kahl but had helped him. Mr. Oliver testified that this created tension, as Mid-State CF staff were upset with Albany's intervention. Despite this, Albany's focus was on ensuring accuracy. The polygraphs consistently showed that Officer Kahl was not assaulted by incarcerated individuals in 4H, leading to the expungement of all misbehavior reports. Mr. Oliver testified that staff at Mid-State emphasized finding a weapon in the 4H dorm "so that they could have those [assault] charges stick" and substantiate their initial claims against the incarcerated individuals (T1-348-349).
Mr. Oliver provided additional details regarding Superintendent Ward's retirement during his testimony. According to Mr. Oliver, he attended a meeting with Superintendent Ward and DSS Corey on or around July 8, 2016 following the July 6, 2016 raid, to discuss the incident from July 3, 2016. The purpose of the meeting was to inform Superintendent Ward that the evidence suggested the incarcerated individuals were truthful about Officer Kahl's injuries, which were caused by a fall rather than an assault. During that meeting, Superintendent Ward did not mention the July 6 raid. Mr. Oliver explained that when officials in Albany later learned about the July 6 raid, the DOCCS Commissioner was displeased that Superintendent Ward had not disclosed it during the July 8 meeting, which ultimately led to Superintendent Ward's retirement (T1-166-167).
Mr. Oliver testified about the dynamic among correctional staff, noting that it often [*9]resembles the "thin blue line" mentality, where officers tend to stick together and corroborate each other's statements. He acknowledged that while this culture has begun to change over the years, it remains common for officers to avoid directly contradicting one another, often responding with "I don't recall" instead of providing detailed accounts (T1-350-351).
On re-direct examination, Mr. Oliver acknowledged in his testimony that, in "he said, she said" situations, without objective evidence, determining credibility becomes a crucial part of the investigation. He agreed with claimants' counsel's suggestion that assessing an individual's demeanor or sizing people up can be important in determining credibility. He also noted that the reports from his team included only the incarcerated individuals' words, without any evaluations of their behavior or demeanor. Regarding medical records, he testified that while follow-up might depend on the situation, it wasn't always necessary to inquire why an individual did or did not report an incident when visiting medical. He was aware that Mid-State CF housed many individuals requiring daily medication. He testified it would not be surprising for incarcerated individuals to visit medical for medication on days following the incident, such as July 7, 8, or 9, 2016 (T1-364-365).
Mr. Oliver was asked if he was aware of any mistakes in his report, to which he responded that he was not. Claimants' counsel then presented specific sections from the report, highlighting discrepancies. Mr. Oliver read the statements of claimants R.B. and N.F., both of whom described incidents involving alleged abuse by officers. Claimants' counsel pointed out that the claims attributed to each incarcerated individual appeared to have been switched, with Mr. R.B.'s claim incorrectly assigned to Mr. N.F., and vice versa. Mr. Oliver testified that he was unaware of these errors (T1-370-372).
PABLO DONES
Claimant Pablo Dones testified that he was housed in one of the four-man rooms in the 4H dorm at the time of the July 6 incident (T1-85). He shared the room with Frank Gillard, Jeremiah Williams, and Tony King (id.). During the raid, Mr. Dones stated that Officer O'Neil grabbed the back of his head and slammed it into the wall, causing a hole in the wall (T1-88). He mentioned that he had never seen the officers "go as crazy as they did" that day, and he was frightened (T1-89). He also described an earlier incident involving Officer Kahl on July 3. At that time, staff questioned him about who assaulted the officer, but he responded that the officer had not been assaulted; instead, he had fallen and hit his head (T1-92).
On July 6 Mr. Dones heard the dorm door bang open and heard officers ordering the incarcerated individuals to return to their rooms while using racial slurs (T1-92). The officers instructed everyone to lie on the floor with their hands on their heads. Mr. Dones testified that he then heard officers enter a room opposite his own and heard R.B. screaming. The officers were pushing something into Mr. R.B.'s rear (T1-95). Mr. Dones recognized Mr. R.B.'s voice because they often played dominoes and talked together (T1-96). He heard Mr. R.B. shout, "why are you sticking that in my backside" and he was screaming it repeatedly (T1-96-98).
After hearing Mr. R.B.'s voice, two officers entered Mr. Dones' room. Mr. Dones testified that he saw Tony King get kicked in the face and witnessed Frank Gillard get kicked in the shoulder (T1-100-101). When Mr. Dones stood up, the officers grabbed him and slammed his head into the wall. Before he stood up, they had kicked him on his right side, near the groin area where he had recently undergone hernia surgery (id.). Officer O'Neil slammed his head into the wall three times (T1-102). Afterward, Mr. Dones was told to pick up his mattress and take it to the magnetometer (T1-103-104). The officers also escorted him to the bathroom to provide a urine sample (T1-104). He further testified that most of the officers had their nametags covered (T1-107-108).
Mr. Dones testified that "all the brass" was in 4H that day, and specifically that the Warden walked through the housing unit and witnessed what had happened (T1-125). Mr. Dones said he put in "about three" property claim forms regarding any alleged property damage but he never got an answer (T1-119-120, 133-135). During cross-examination, Mr. Dones testified that he filled out an injury report dated August 11, 2016, in which he mentioned receiving a kick in [*10]the groin (T1-127; Exhibit PPP). Mr. Dones further testified that as he was walked into and back out of the bathroom by an officer to provide urine, he saw and heard J.D. being punched and kicked by another officer in a bathroom stall (T1-103-106, 138-145). Mr. J.D. was positioned by the side of the stall wall and was attempting to urinate, repeatedly telling the officer that he could not do so. Mr. Dones testified that Mr. J.D. was crying out in pain and said, "I can't piss, and you kicking me and hitting me is not going to get me to piss" (T1-136-137). Mr. Dones witnessed the officers strike Mr. J.D. approximately three times (id.). Portions of Mr. Dones' testimony was corroborated by claimant Jeremiah Williams, who testified that he observed an officer throw Mr. Dones headfirst into a wall, causing a hole in the wall (T1-721, 727, 745-746), and by N.F., who also testified that he saw Mr. Dones being thrown into a wall (T2-183-184). No clear evidence was presented during the trial to show that Mr. Dones had exhausted the available administrative remedies concerning his allegedly damaged or destroyed property (T1-119-120).
EZEQUIEL MARTINEZ
Claimant Ezequiel Martinez testified that during the raid several COs threw him to the ground, beat him, and destroyed all of his belongings (T1-216). Mr. Martinez stated that he was punched in the back of the head, kicked in the ribs, and struck in the side with a stick (T1-216, 221-222). He claimed that he was on the floor for half an hour and never saw who assaulted him (T1-217-218).
In his testimony, Mr. Martinez testified that the officers were breaking everything in his room, including property and food, while throwing objects across the room. He relayed how terrified he was, noting that he was shaking and afraid of being beaten up for no reason. When asked if he could see the officers responsible, Mr. Martinez testified that he was unable to because he was lying on the floor with his head down, fearing that if he looked up, he would be beaten more severely. He kept his face down out of fear, not wanting to provoke further violence (T1-216-217). Following the raid, he testified that everything in the dayroom was destroyed. The TV was broken, the phone was damaged, and items were trashed and scattered everywhere (T1-220). He did not file a property damage claim as it relates to the incident on July 6, 2016 (T1-231).
In this portion of his testimony, Mr. Martinez confirmed the accuracy of a written statement he signed (T1-234-235; Exhibit RRR). The statement details an incident on July 6, 2016, in the 4H Housing Unit, where officers assaulted him and others. Mr. Martinez describes being kicked in the ribs and threatened with death if he reported the assault. He was warned that if he spoke out, the officers would return, assault him again, and ensure he wouldn't go home. Mr. Martinez confirms the statement is true and testified that he was scared for his life and just wanted the threats and assaults to stop (id.).
COLE BRYANT
In his testimony, claimant Cole Bryant describes a violent and chaotic search conducted by officers in the 4H dorm. Upon entering the room, the officers ordered everyone to lie face down on the floor. After complying with the order to unlock his locker, Mr. Bryant witnessed the officers trashing the room, kicking over beds, throwing lockers, and pouring food over his legal paperwork (T1-303). Mr. Bryant testified that an officer then stomped on his head, forcing him to keep his face down. Mr. Bryant testified that officers kicked him in the ribs, stomped on his head and back, and destroyed his legal papers (T1-303-304, 316, 326). Additionally, Mr. Bryant testified that he heard racial slurs, including the term "cock-sucking niggers" (T1-301-302). Mr. Bryant testified hearing an officer tell another person, R., "this is what it feels like to be helpless", while he listened to sounds of kicks and punches (T1-304). After being ordered to take his mattress out into the hallway, Mr. Bryant testified he noticed R. still lying face down on the floor (T1-302-305). Mr. Bryant testified later on, after giving urine and while waiting on the bench in the dayroom, he saw the Superintendent come to the door of the housing unit. He observed the Superintendent observing what was happening inside, speaking with one of the officers, and then leaving (T1-310). He also stated that staff threatened them against seeking medical attention, warning of consequences if they did (T1-311). Mr. Bryant testified that he did [*11]not appeal the denial of his property claim (T1-321).
RICARDO MOORE
Claimant Ricardo Moore testified that his initial placement at Mid-State CF was in the veterans' dorm, a special unit for individuals with verified DD214 forms, organized with military-style structure. He stayed in this dorm for a brief period but was removed after allegedly witnessing a sexual assault by an officer on an incarcerated individual (T1-379). Mr. Moore testified that after being removed from the veterans' dorm, he was placed in the 4H dorm around November 2015. His title from the veterans' dorm, where he had served as an "echelon" supervisor, carried over. Mr. Moore testified he was appointed as the chairperson of the Inmate Liaison Committee (ILC), which is mandated by DOCCS rules and present in every facility (T1-380). Mr. Moore confirmed that he was familiar with the senior staff ("brass") at Mid-State CF, including Sgt. O'Neil and Lt. Hebble, and stated that he would still recognize them today. He also recalled that in July 2016, while housed in 4H, he occupied one of the two single rooms, likely bed 13, as he was both the clerk of the unit and the chairperson of the ILC at the time (T1-382).
Mr. Moore testified about the events on July 3, 2016. According to Mr. Moore, Officer Kahl came to work for the 3:00 p.m. to 11:00 p.m. shift, informed Mr. Moore that he wasn't feeling well and instructed Mr. Moore to ensure that no one bothered him that day. After conducting a count, Officer Kahl reiterated to others that he wasn't feeling good. Later, while preparing for the afternoon chow, Mr. Moore noticed that Officer Kahl was leaning back in his chair with a book on his chest. Mr. Moore testified he went to his room to change his shoes and heard a commotion. Upon returning, he saw a group gathered around Officer Kahl, who was bleeding. Mr. Moore testified that when Office Kahl was asked if they should pull the emergency pin, Officer Kahl refused (T1-385). Mr. Moore then instructed others to alert help by banging on the door. Eventually, an incarcerated individual pulled the pin, and officers arrived to assist Officer Kahl. Mr. Moore later told Sgt. O'Neil that Officer Kahl had fallen from his chair, but apparently Sgt. O'Neil became angry, accusing Mr. Moore of lying (T1-386-387). Mr. Moore testified the situation escalated as the unit remained on lockdown, with incarcerated individuals being questioned. Ultimately, according to Mr. Moore, he and others maintained that Officer Kahl had fallen from his chair (T1-384-389).
On the morning of July 6, 2016 Mr. Moore testified he recalled observing a green, full-sized school bus approaching Building 4 at a high speed. Mr. Moore testified he was concerned, so he quickly ran through the housing unit, waking up incarcerated individuals, urging them to get up and prepare for what he perceived as an impending threat. By the time he reached the back rooms, he was shocked to see everyone running into the dayroom. He testified that normally, during a frisk, a count would be called to keep everyone accounted for, but no count had been called. Mr. Moore testified when he turned around, he saw a large number of officers entering the dayroom (T1-390-393).
Mr. Moore testified that as officers entered the dayroom, incarcerated individuals began trying to flee, but there was nowhere to go due to the layout of the housing unit. Mr. Moore observed officers physically assaulting incarcerated individuals, knocking them to the ground, kicking and beating them as the officers moved through the dorm. The assaults continued until officers reached his area. Mr. Moore testified that he witnessed grown men screaming, crying, and asking why they were being hit despite complying by lying on the ground. Mr. Moore could not identify specific individuals being assaulted because the violence was happening to everyone indiscriminately. As officers approached Mr. Moore's room, he testified an officer yelled "where's that fucking Johnnie Cochran dude at?"- referring to Mr. Moore, though he did not know the officers' names and the officers had no name tags (T1-394-398). When they reached him, they kicked a mop bucket filled with bleach into his face. The bleach burned his eyes and throat, making it difficult for him to breathe. When he tried to protect his face with his hands, an officer stepped on his right hand, preventing him from moving (T1-394-397) and wiping the bleach off, while also kicking him in the head and ribs (T1-397). The officer also opened Mr. Moore's locker, threw his food around the room, damaged his legal documents and Black's Law [*12]Dictionary, and cut his headphones and extension cord with a pocket knife (T1-399).
KEITH GATES
Claimant Keith Gates testified that by July 2016, when the incident occurred, he had been at the facility for approximately eight months (T1-438). Mr. Gates recalled Officer Kahl, describing him as a young officer who was well-liked and considered one of the best COs there. Before July 3, 2016 Mr. Gates noted that Officer Kahl was very active, frequently moving around and engaging with everyone (T1-442). Mr. Gates confirmed that he clearly remembers July 3, 2016, the day Officer Kahl was injured (T1-443).
Mr. Gates described being in the dayroom on July 3, 2016 either on or just getting off the phone, when Officer Kahl entered, stating that he wasn't feeling well and wanted to be left alone. Mr. Gates testified he witnessed Officer Kahl get up from his chair, appear lightheaded, and fall, hitting his head on a locker. He recalled seeing Officer Kahl's face just before he fell. Several people ran into the bubble to help, but Officer Kahl insisted he could manage on his own. Despite this, the pin was pulled, and more officers arrived. Shortly after, a facility count was called (T1-444-446).
Mr. Gates testified that on the morning of July 6, while he was in the dayroom, Ricardo Moore alerted others by saying, "they were coming", signaling the approaching officers (T1-456). Mr. Gates stated that while he was in the dayroom getting ice for his food, the officers entered through the door (T1-456-457). Mr. Gates testified how, during the raid, officers instructed everyone to get on the floor, and those who didn't comply were hit. He recalled that he was getting ice when his friend, Carl Champagne, who Mr. Gates mentioned was "a little slow", did not immediately move when the officers entered (T1-458). Mr. Champagne was the first to be assaulted as he walked down the hallway, with the officers knocking him to the ground (T1-458, 460). Mr. Gates recounted the raid on July 6, 2016 describing how he ran down the hallway while officers stormed in, shouting for everyone to get on the floor. Mr. Gates, carrying ice, ran to his room, yelling warnings to others as he went. Once in his room, he recounted how he hid under his bed, terrified by the screams of other incarcerated individuals being assaulted. When officers entered his room, he testified that they kicked him in the hip to get him out from under the bed, forced him to open his locker, and then proceeded to destroy his belongings. One officer smashed his radio and smeared peanut butter on his face. Afterward, Mr. Gates was taken for questioning, where the officer even remarked about the peanut butter on him (T1-459-464).
Mr. Gates testified that an officer slapped him in the face and struck him several times using two-foot-long pepperoni sticks from his locker (T1-465-466, 503-504). The officers also destroyed photographs of Mr. Gates' family and pieces of his clothing (T1-474-476, 480-481). Mr. Gates testified that he was not physically injured by the slap with the peanut butter, but he was sore and bruised from being kicked during the incident. He estimated that the soreness lasted about two weeks, though he couldn't recall the exact duration. He also mentioned being bruised from the pepperoni stick but confirmed there were no broken bones (T1-506). He also testified that he was not seriously injured, experiencing only some bruising and soreness, which resolved in a few weeks (T1-505-506).
Mark Canada partially corroborated Mr. Gates' account, testifying that he saw Mr. Gates being chased down a hallway and heard him screaming (T1-559). However, in Mr. Gates' Grievance dated August 30, 2016, he mentioned being kicked in the side, punched in the head and stepped on, with no reference to the pepperoni stick (Exhibit 69).
MARK CANADA
Claimant Mark Canada testified that during the July 6, 2016 raid, he was thrown to the floor, had a mattress placed over his head, and an officer stood on the mattress while kicking him in the side two to three times and smacking him in the head (T1-543-545, 552-553). He also stated that they smacked him in the head with an open hand at one point (T1-550, 555). Mr. Canada testified that he suffered a broken rib during the incident but did not seek medical treatment for it (T1-553). Mr. Canada also stated that much of his property, including eyeglasses, clothing, photographs, and food items, were destroyed, and food was poured over him (T1-551). [*13]He did not file a property claim (T1-559). Mr. Canada's testimony was partially corroborated by claimant Alec Hammond, who testified that he observed Mr. Canada being roughed up and thrown to the ground (T2-244-245).
CARL CHAMPAGNE
Claimant Carl Champagne testified that during the July 6, 2016 raid, he was first slammed to the ground by an officer, who then held him down for about 30 minutes by pressing a knee into his back (T1-578-579, 582). Mr. Champagne testified that after an officer clotheslined him, the officer held him down and had an arm around his neck. During this time, an officer also sprayed Mr. Champagne with a fire extinguisher (T1-578, 582). Mr. Champagne testified he initially thought he was being urinated on, but when he looked up, he saw the officer walking away with the fire extinguisher in hand. Despite his attempts to look around, Mr. Champagne testified the officer holding him down forced him to face the laundry room, yelling at him to stay still. Mr. Champagne was then forcibly placed against a wall and punched multiple times in the back and ribs (T1-585-586, 595-597). While restrained, other officers passed by, throwing things on him (T1-579-582). Additionally, officers destroyed Mr. Champagne's letters, family photographs, food, and clothing (T1-592).
Mr. Champagne's testimony was partially corroborated by multiple claimants: Keith Gates testified that he saw Mr. Champagne being knocked to the ground (T1-458); Kyle Finch testified that he witnessed Mr. Champagne being dragged down a hallway (T1-841); Alec Hammond testified that he heard Mr. Champagne screaming and "the air leaving his lungs" (T2-246); and J.D. testified that he saw one officer kick Mr. Champagne in the gut and another officer hit the back of his head while he was on the ground (T3-21).
MATTHEW PETRILLO
Claimant Matthew Petrillo testified that on July 6, 2016 he was housed in bed 25 of the 4H dorm in a four-man room. His roommates included N.F., J.D., and another individual whose name he could not recall. On the morning of the raid, Mr. Petrillo testified he was sleeping when someone woke him up, and he saw a bus full of officers arriving. The officers instructed the incarcerated individuals to lie face down with their palms on the floor. Mr. Petrillo heard commotion and people yelling, indicating something bad was happening. He specifically remembered seeing an officer stepping on Mr. J.D.'s hand and then moving up to his forearm, causing Mr. J.D. to scream in pain (T1-616-618).
Mr. Petrillo testified that while he was lying on the ground, a locker was slammed into his face (T1-618-619). Officers then emptied the contents of his locker onto the floor and repeatedly hit him in the face with the locker door (T1-619). Afterward, an officer kicked Mr. Petrillo in the side, described as "like a football" kick, and stomped on his feet and arm multiple times (T1-620-623). Mr. Petrillo further testified that he was punched in the face (T1-625). Mr. Petrillo could not identify any of the officers involved and did not recognize those who used force on others (T1-626, 630). He also mentioned that almost everyone submitted sick call slips after the incident (T1-633-634). However, Mr. Petrillo had no recollection of filing a grievance related to medical care or property damage following the July 6, 2016 incident (T1-643-644).
Mr. Petrillo's testimony was partially corroborated by J.D., who testified that he saw an officer smash a locker door onto Mr. Petrillo's face multiple times (T3-26-27).
LENARD COX
Claimant Lenard Cox testified that on the morning of July 6, 2016, he was sleeping in his bed when he was suddenly pulled from the bed by COs. He initially thought that other incarcerated individuals were attacking him but realized it was the officers, so he quickly dropped back to the floor. Mr. Cox explained that he couldn't remember the exact details of how he was pulled from the bed (T1-664-665). He testified that officers "ripped" him out of his bed and threw him to the floor, causing him to land on his face and side (T1-663-664). Afterward, officers threw his bed on top of him, and multiple officers jumped on his back, buttocks, and legs, jumping on him "like a trampoline" while he lay face down, covered by the mattress (T1-667-668). Mr. Cox testified that the COs verbally abused him, using racial slurs and derogatory [*14]language and destroyed his belongings while he lay on the floor. Mr. Cox testified he was scared throughout the incident, fearing for his life, especially as the officers made comments about being able to kill people without consequence. He described the experience as terrifying, leaving him unsure if he would ever see his family or children again (T1-667-669).
Mr. Cox also testified that the officers destroyed his cosmetics, clothing, and food items during the incident (T1-667, 670, 687-688). He noted that the bruising and pain he experienced from the event subsided within a week or two (T1-696). Mr. Cox claimed to have filed a property claim and an appeal regarding its denial, but he was unable to provide documentation of these claims at trial (T1-703-704). Mr. Cox also testified that he witnessed Alec Hammond being kicked in the face "like a football" and saw Greg Pearsall being punched to the ground (T1-670-671).
JEREMIAH WILLIAMS
Claimant Jeremiah Williams testified that on the morning of July 6, 2016, he was sitting on his bed in his room when he first became aware that something unusual was happening. He learned from someone across the hall that two buses filled with COs were outside and about to come upstairs. Shortly after, Mr. Williams testified he heard the officers running up the stairwell, describing the noise as resembling a football team getting ready to go through a tunnel. He testified that the COs entered the dorm room and ordered everyone to lie on the floor with their arms stretched out. While on the ground, Mr. Williams heard incarcerated individuals throughout the dorm screaming in agony, creating a sense of chaos (T1-723-724).
Mr. Williams testified that officers stomped on his right ankle, punched him in the ribs, and either slapped or punched him in the back of the head when they entered his room (T1-726). He also stated that officers threw peanut butter, jelly, toothpaste, coffee, Kool-Aid, and other items on him, while scattering his clothes, pictures, and the music and movie scripts he had written (T1-727, 730). Mr. Williams testified that, during the raid, he heard racial slurs and hostile comments from COs. He testified one officer shouted, "get down, nigger", while another officer said, "this is what you want, this is how you like it", coming from the hallway area toward the back of the dorm (T1-729). In response, Mr. Williams heard incarcerated individuals screaming, "get off of me" (id.).
Mr. Williams testified that during the raid on July 6, 2016 officers went through the lockers, throwing around personal property, including his clothing, pictures, and writings, which were destroyed. The officers were in his room for about 10 to 15 minutes, during which he remained on the floor, feeling helpless and praying for his safety. He was unable to identify the COs in his room due to their name tags being blacked out (T1-728). After the raid, the incarcerated individuals were lined up in their boxers and taken through the towers (magnetometers), where Mr. Williams described himself as looking like he had "just rolled in a dumpster" (T1-732). Upon returning to his room, he found it in disarray, as if "a tornado went through there" (id.). Afterward, he changed clothes, and the incarcerated individuals were instructed to provide urine samples (T1-730-733).
Mr. Williams testified that during the raid on July 6, 2016 he recognized several officers and supervisors, including DSP Joslyn, Sgt. O'Neil, and the Superintendent. He identified them from their regular presence on the compound. Mr. Williams observed the Superintendent and DSP Joslyn walking through the dorm, inspecting the aftermath of the raid, with the Superintendent nodding his head as he passed each room. Mr. Williams testified that he did not hear either of them say anything. Sgt. O'Neil was positioned near the front of the dorm by the bubble. After the Superintendent and DSP Joslyn left, Sgt. O'Neil threatened the incarcerated individuals, saying that if they called home, went to medical, or told anyone about what happened, the officers would return (T1-735-738).
At his examination before trial (EBT), however, Mr. Williams only mentioned one slap to the back of his head and one stomp to his ankle, without mentioning any punches to his ribs (T1-747-748). He testified at trial that he did not file a property claim after the incident (T1-748). Mr. Williams also recounted seeing an officer pick up Pablo Dones and throw him headfirst into a [*15]wall (Exhibit 6; T1-721, 727, 745-746). However, Mr. Dones testified that two officers slammed his head into the wall three times (T1-102, 115).
JACE DAVIS
Claimant Jace Davis testified that during the raid several officers went through his property and poured syrup, honey, and shampoo all over his head and face (T1-762-763). While Mr. Davis lay on the floor, one officer placed a boot on his knee for approximately one minute, causing significant pain (T1-763-65). Additionally, an officer stomped on and destroyed Mr. Davis' radio (T1-768).
Mr. Davis testified that the only use of force he experienced was having the officer step on his knee while he was lying face down (T1-763). His testimony regarding whether he sought treatment for his knee was unclear, as he claimed he was repeatedly sent back and forth between the infirmary and his dorm (T1-769). He mentioned that the pain lasted about a week, but he was still able to play sports during that time (T1-770). Mr. Davis also testified that he filed a property claim but did not recall receiving any compensation or filing an appeal for any denial, and he no longer had the relevant paperwork (T1-773-774).
BRIAN KELLY
Claimant Brian Kelly testified that on the morning of July 6, 2016 he was sleeping in his bed when he was abruptly awoken by loud noises from COs entering the dormitory aggressively. He described hearing the officers yelling threats and slurs, including racial and derogatory comments, as well as furniture being thrown, beds being flipped, and other incarcerated individuals screaming in pain as they were assaulted. When the officers reached his room, they ordered Mr. Kelly and his roommates to lie on the floor, face down, without looking at them (T1-792-795).
Mr. Kelly testified that this was not a routine search but rather an act of revenge for a prior incident (T1-792-801). He described feeling "scared to death" as he lay on the floor during the raid, anticipating retaliation for a prior incident (T1-799). He testified he was sweating, tensing his body, and tucking his head in as objects were being thrown around. Mr. Kelly felt trapped in a "fight or flight response" but knew he could neither fight back nor flee (id.). He heard noises indicating his roommate across from him was being attacked, although Mr. Kelly struggled to clearly explain which roommate he was referring to in that moment (T1-799-800).
Mr. Kelly testified that while he was lying on the floor, an officer thrust his knee into his back with full weight and then pushed his face down (T1-801). Mr. Kelly also had toothpaste, shampoo, and peanut butter poured on his head (T1-803). Another officer then grabbed him by the neck, slammed him into the hallway wall, causing the back of his head to strike the concrete (T1-806). Mr. Kelly was then slammed into the wall again and punched three times in the left side of his ribs with a gloved fist (T1-806).
Mr. Kelly testified that much of his property was destroyed, and what remained was mixed with the belongings of other individuals, making it difficult to determine ownership (T1-809). His prescription eyeglasses, clothing, food, and hygiene products were also destroyed, and his sneakers were cut up with knives (T1-809-810). Mr. Kelly's testimony was partially corroborated by Keith Gates, who testified that while he did not witness the assault, he heard Mr. Kelly telling an officer to stop hitting him (T1-468). Mr. Kelly claimed he filed a property claim for his damaged eyeglasses, but no evidence of the claim was presented at trial (T1-822).
KYLE FINCH
Claimant Kyle Finch testified that on the morning of July 6, 2016 he was sitting on his bed when he first heard officers yelling, "get on the ground" (T1-840-841). He saw several COs dragging Carl Champagne down the hallway. Mr. Finch then lay down on the ground, with his feet in the hallway and the rest of his body in his room. Two officers entered his room, began destroying his belongings, and smashed his locker open using the bottom of a fire extinguisher. They threw his clothes, food, and other items around the room (T1-840-843).
Mr. Finch testified that an officer kicked him hard on the right side of his face, underneath his eye, causing his eyeglasses to break (T1-843-845). Mr. Finch also testified that he [*16]had been sprayed with mayonnaise, after which an officer, or officers, stepped on him and then kicked him in the face (T1-842, 844-845). Mr. Finch stated that he did not know how the holes in the wall were made (T1-840). Officers also destroyed Mr. Finch's clothes, food from the commissary, and tobacco packages (T1-859). He testified that he did file a property damage claim, but did not exhaust his administrative remedies (T1-864).
ISRAEL MIRANDA
On the morning of July 6, 2016 claimant Israel Miranda was lying on his top bunk, listening to rock music through his ear pods when he heard people in the dayroom saying, "they're coming" (T1-879). Despite the warning, he continued listening to his music, paying little attention to the commotion. Moments later, COs pulled him down from his bed by his legs. Mr. Miranda testified that he was yanked from the top bunk and fell onto a chair before hitting the floor. When he landed, he saw another incarcerated individual already on the floor with his hands behind his back (T1-879-881).
Mr. Miranda testified that after officers pulled him out of his bed by his legs, they began beating him (T1-879-881). While Mr. Miranda was on the ground, an officer climbed onto a chair, then onto his bed, and jumped down, landing on his back and stomping on him (T1-882). The officers resumed beating him, kicking him in the face, ribs, and neck, while threatening him with death (T1-882-883). Mr. Miranda testified that he was kicked in the ribs more than ten times and punched in the face more than seven times (T1-886). The officers also poured commissary items over him and his fellow roommates and destroyed his property, including packages from his family, sneakers, long johns, undershirts, socks, and button-down shirts (T1-899-901). Mr. Miranda testified he was on the floor for about three hours and that after being taken to the porch, he was hit in the ribs again (T1-887, 896). He was also punched in the neck while waiting to go through the metal detector, which he claimed was set up in the dayroom (T1-897). Mr. Miranda testified that he was left on the dayroom wall in handcuffs for three hours, which caused his wrists to hurt (T1-903-904). He was later pushed toward the wall of the porch and hit on his left side, remaining there for another two hours before being brought back to the dayroom, where officers continued questioning him and punching him in the ribs (T1-904-905). Mr. Miranda testified Sgt. O'Neil kicked him in the head while he lay in the hallway and punched him in the ribs (T1-909, 922).
Mr. Miranda's testimony was partially corroborated by Alec Hammond, who had a bed in the same 12 man room (T2-239). Mr. Hammond testified that he saw the man in the lower bunk below Mr. Miranda get pulled out of his bed and dropped on the floor, and then Mr. Miranda was pulled out of the top bunk and dropped on top of his bunkmate (T2-243-245). Mr. Miranda also testified to experiencing memory problems due to PTSD and schizophrenia, which sometimes impacted his recollection of events (T1-872-873, 914). He believed he had filed a property claim, but no evidence of the claim's outcome was presented at trial (T1-932). Mr. Miranda also testified that officers used racially insensitive language during the dorm search (T1-885).
TONY KING
Claimant Tony King testified that while lying on the floor during the raid, he was kicked and stomped all over his body, including his head, back, arms, and legs (T1-946). He also testified that officers threw lockers and other items on him (T1-950-951). Mr. King stated that this beating lasted for at least half an hour, during which officers were calling the individuals "bogus names" (T1-946). He further testified that he attempted to submit a sick call slip, but the slips were being discarded (T1-948). Mr. King's testimony was corroborated in part by Jeremiah Williams, who testified that he saw an officer kick Mr. King in the face (T1-726), and by Pablo Dones, who testified that he witnessed an officer kick Mr. King in the head (T1-100).
MICHAEL RUSSELL
Claimant Michael Russell testified that the morning of the raid while he was sleeping, officers snatched him out of bed, slammed him to the floor, stomped on his neck, kicked him in the face and back, threw food and ketchup on him, and scattered his clothes and medications throughout the room (T1-965). Mr. Russell testified he was struck in the face more than five [*17]times (T1-965-966). One officer held his neck down with a boot while another officer kicked him and hit him with various objects (T1-966). Additionally, Mr. Russell testified that cans of tuna, clothes, and other items were thrown at him, and he had ketchup, mustard, and other wet substances sprayed all over his face, head, and back (T1-969-970). He testified that officers also poured out his HIV and psychiatric medications (T1-970). Mr. Russell stated that he filed a property claim but never received a resolution (T1-978). No evidence was presented at trial to show that he had exhausted his administrative remedies regarding this claim.
RALPH WHITE
Claimant Ralph White testified that during the July 6 raid while he was standing against the wall, officers struck him on the side of the head (T1-1019). One officer then kneed Mr. White and threw him to the ground (T1-1019). Additionally, officers destroyed Mr. White's commissary items, including packages from his family, cigarettes, and coffee (T1-1022). Mr. White also testified that he was beaten in the head with a dictionary (T1-1024). He further stated that an officer pushed a knee onto his neck and back, and that he was elbowed, thrown against the wall, and subjected to a racial slur (T1-1018, 1019, 1021).
N.F.
On the morning of July 6, 2016 claimant N.F. was informed by a fellow incarcerated individual that COs were about to perform a "shakedown" of the dorm. Thinking it would be a routine search, Mr. N.F. testified he went to the laundry room to dispose of some chicken bones before the officers arrived. As he reached the laundry room, an incarcerated individual ran past him, and he heard loud noises and screams, which he likened to the excitement of a football team preparing to enter the field. He testified that moments later, officers charged at him, ordering him to get on the floor before forcefully slamming him down (T2-156-158).
Mr. N.F. testified that the assault on him began when officers grabbed him and slammed him to the floor in the laundry room (T2-158-159). About four officers entered the room, threw laundry on him, attempted to detach a nailed-down dryer, and punched him in the face multiple times while questioning him, "where is it at?" (T2-161-162). Mr. N.F. explained that the dorm had just been searched three days earlier and there was nothing there, but the officers did not relent. He testified they pulled down his pants and slammed the bowl he had chicken wings in against his buttocks shattering the bowl (T2-161-162). The officers then immobilized Mr. N.F. with a towel around his waist, and one officer inserted an object into his rectum. He explained it like this: "they just put something in there. I don't know what the fuck they put in there. They just shoved something in my rectum. I felt something penetrate in my rectum" (T2-164). While doing so, an officer referenced the alleged assault on Officer Kahl and said, "how does it feel to be helpless, like my officer was helpless?" (T2-162-164). Mr. N.F. estimated that there were four officers in the room during the assault (T2-164).
Additionally, the officers destroyed Mr. N.F.'s sneakers, several shirts, food, and other personal property, including photos of his family (T2-174-175). He testified that although he was punched in the face eight to nine times, he did not suffer injuries from these punches (T-189-190). Mr. N.F. further testified that he was ordered to the bathroom to provide urine when an officer put his penis and testicles in the urine cup and told him to urinate (T2-171). His urinalysis came back clean (id.). Mr. N.F. could not remember if he filed a property claim, nor did he provide proof that he exhausted administrative remedies regarding his property (T2-190).
SHABAR CHAMBERS
Claimant Shabar Chambers testified that during the raid he was punched in the stomach by an officer, possibly twice (T2-219-220, 230). He testified he was then directed to lie on the floor while an officer broke the lock on his locker with a fire extinguisher and poured ketchup, mayonnaise, soup, and other condiments on his back (T2-220-221). The officer who punched Mr. Chambers also tore up fifty pictures of his parents in front of him, and his tapes, Walkman, and headphones were destroyed (T2-221-223). Mr. Chambers' testimony was corroborated in part by Ricardo Moore, who testified that he observed Mr. Chambers being assaulted (T1-400-401).
Mr. Chambers also testified that he had been placed in handcuffs while in the bathroom [*18](T2-218). Mr. Chambers stated that the punches to his stomach were the only uses of force against him that day (T2-221). He witnessed the use of force against Roy Bowers from the bathroom, describing how Mr. Bowers was tackled and resisted the officers (T2-227-228). Mr. Chambers did not file a property claim related to the raid (T2-231).
ALEC HAMMOND
Claimant Alec Hammond testified that on the morning of July 6, 2016 he was asleep in the 12 man room as he had the day off from programs. His bed was located in the far back right corner of the room. Mr. Hammond first heard yelling and footsteps but remained in bed trying to stay asleep. He was ultimately awoken when officers ripped him out of his bed and threw him onto the floor (T2-239-240). Mr. Hammond testified that he was awoken when the officer grabbed the scruff of his neck and his waist, pulling him horizontally onto the floor (T2-240-241). He was then kicked in the mouth "like a football punt" and had the back of his head stomped on (T2-241-242). Mr. Hammond also testified that he was kicked a couple of times in the torso, and that officers stood on the backs of his legs while they searched his locker, later pouring half a jar of Adobo seasoning and shampoo on him (T2-254-256, 288).
Mr. Hammond's testimony was corroborated in part by several claimants: Cole Bryant, who testified that he saw Mr. Hammond being assaulted by officers (T1-308); Lenard Cox, who testified that he saw Mr. Hammond's face being kicked "like a freaking football" (T1-670-671); Kyle Loucks, who testified that he observed Mr. Hammond being kicked in the face (T2-381, 388-389); and Gregory Pearsall, who also testified to witnessing Mr. Hammond being kicked in the face (T2-162-163). Mr. Hammond did not file a property claim related to the incident (T2-280).
ROY BOWERS
On the morning of July 6, 2016 claimant Roy Bowers had just returned to the 4H dorm after breakfast, around 7:10 a.m. or 7:15 a.m., and was smoking a cigarette in the dayroom near the bathroom, waiting to be informed about when he could return to the hospital for boots. While smoking, Mr. Bowers testified he noticed two buses outside the window of the porch area (T2-303-304). He saw officers exiting the buses and ran into the bathroom, where he alerted three or four others, including a man nicknamed "6-9." He then peeked out of the bathroom door and saw the officers in the hallway through a small window in the entrance door. Mr. Bowers attempted to run back to his room but was stopped in the hallway between the bubble and the hallway when the officers ordered everyone to get on their stomachs. Mr. Bowers testified he got on his stomach and "they just started whipping on me" (T2-302-306).
Mr. Bowers testified that during the raid, he attempted to crawl under a table, but officers threw the table over and dumped a bucket of ice on him (T2-306-307). He was then kicked, punched, and stomped on by several officers all over his body (T2-308-309, 327). He estimated that the beating lasted for three to four minutes (T2-327). Mr. Bowers also testified that he was roughed up while handcuffed and, during a strip search, officers stepped on his bare feet, pulled his hair, and pushed his head against the wall (T2-313). He stated that his hair was pulled out during the incident (T2-311). Mr. Bowers, who had long dreadlocks at the time, testified that several of them were pulled out by officers during the raid (id.). Mr. Bowers claims that Sgt. O'Neil kept one of his dreadlocks and tied it around his golf bag "as a souvenir" (id.).
Mr. Bowers' testimony was corroborated in part by several claimants: Shabar Chambers, who testified that he saw Mr. Bowers being tackled to the ground and punched and kicked in the head, stomach, and legs (T2-228); Kyle Loucks testified he recalled seeing long dreadlocks on the floor (T2-381); J.D., who testified that at least three officers assaulted Mr. Bowers (T3-19-20).
Mr. Bowers agreed that the injuries noted on his Inmate Injury Report - swelling under his left eye, a small cut on his right cheek, and a red mark on his lower back - were accurate (T2-324-325; Exhibit 75, p. 54). He received a misbehavior ticket as a result of the incident, and the guilty determination was never reversed (T2-328). Mr. Bowers did not file a grievance related to the events of July 6, 2016 and sought medical treatment for his injuries about a month or two [*19]after being transferred to Five Points the day after the incident (T2-328-329).
MATTHEW ALIAGA
On the morning of July 6, 2016 claimant Matthew Aliaga testified he was in his cubicle in the 4H dorm when he was alerted by a frantic incarcerated individual running by. That individual told him that officers had just entered the dorm. Mr. Aliaga testified he heard a lot of commotion, including sounds of fighting and yelling, before spotting officers moving toward the back of the dormitory. He stayed in his cubicle and never left the area. He testified the officers, in the hallway of 4H, began instructing everyone to get on the ground and face down. As Mr. Aliaga complied with the instruction to get on the ground, he observed the officers starting to push things over (T2-340-342).
Mr. Aliaga testified that an officer directed him to crawl on the floor, after which the officer stepped on his ankle and knee (T2-342-343). Other officers then poured coffee grinds and lotion on him and destroyed his gender-transition medication by pouring it out and stepping on it (T2-343-244). The officers also destroyed a large package of his food, along with family photos and a book (T2-345). Mr. Aliaga testified while undergoing a search against the wall, another officer forcibly grabbed his chest, yanked him off the wall, and thrust his waist into Mr. Aliaga's his backside (T2-348-349, 355). This was corroborated by J.D. who witnessed an officer rubbing against Mr. Aliaga's backside stating something to the effect of "don't fight it, you know you want it" (T3-29). In July 2016, Mr. Aliaga was on a medical regimen that included antivirals and hormone therapy. As a result of the hormone treatment, Aliaga began developing a chest, which was very sensitive to touch during that time (T2-338).
KYLE LOUCKS
Claimant Kyle Loucks testified that he was in the 12 man room in the 4H dorm and Mark Canada and Alec Hammond resided there too (T2-373). On the morning of the raid, Mr. Loucks testified he heard officers yell "get on the ground" (T2-375). Mr. Loucks heard lockers being broken, chairs being thrown around, walls breaking and "putting holes in the walls" (T2-376). Mr. Loucks testified that while lying on the ground, he was slapped and punched in the head, kicked in the ribs, and had his face smashed into the ground (T2-377). Mr. Loucks testified that he was told by the officers not to look at them. He also testified that a mattress was placed on his face while he lay on his back, causing him to suffocate. While he was on the floor, an officer said "how does it feel to be scared . . . and be helpless. How do you think that CO felt" which Mr. Loucks took to be a reference to the July 3, 2016 incident (T2-377-378). Later, when he was required to provide urine for urinalysis, Mr. Loucks initially could not provide a sample, prompting an officer to threaten him with death if he did not comply (T2-379). Alec Hammond corroborated Mr. Loucks' testimony about the assault, stating that he observed officers pelting Mr. Loucks with bars of soap (T2-258). Although Mr. Loucks did not testify as to the bars of soap, the Court notes his testimony that his face was covered with a mattress.
Mr. Loucks also testified that Sgt. O'Neil threatened them that if they went to medical, or reached out to family, there would be repercussions (T2-379). He testified the officers cut the cords on their telephone, on the televisions and monitored their mail (id.). Mr. Loucks described Sgt. O'Neil as a heavyset, short Caucasian man who "looked like the father from Family Guy" (T2-382).
J.D.
Claimant J.D. testified he first came to the 4H dorm around December 2015 (T3-10). He testified it was common knowledge around the dorm don't mess with Sgt. O'Neil (T3-12). On the morning of the raid, Mr. J.D. was heading back to his room when the door to the dayroom swung open and the officers came pouring in (T3-15). As the officers came in, they were smashing and breaking everything in their paths. He heard screams and thuds from lockers falling (T3-21). Mr. J.D. said he hid under his bed (T3-22). None of the officers had nametags on for identification purposes (T3-24).
Mr. J.D. testified that the assault on him began when he was dragged out from under his bed by his hair (T3-24). He was then kicked, punched, stomped on, and had officers step on his [*20]arms and back while they dumped his food on him (T3-24-25). Mr. J.D. testified that he was kicked more times than he could remember, punched several times, and used as a "trampoline" by an officer who jumped on his back (T3-25). When he was required to provide urine for a urinalysis that followed, Mr. J.D. was unable to urinate, prompting Officer O'Neil to punch him repeatedly and threaten him with death (T3-32-34). Mr. J.D. testified that Officer O'Neil "had a very strange way of acquiring a urine sample" (T3-32). Officer O'Neil had him put his arms straight up, then pull his shirt up, tuck it under his chin and undo his pants and boxers and pull them down to his ankles (T3-32-33). He hit Mr. J.D. several times in the ribs and back so he fell down and then got up again (id.). Officer O'Neil then flicked Mr. J.D.'s penis three or four times, saying, "Come on there, little guy, we just need a few drops" (T3-34). At that point Mr. J.D. ran out of the bathroom (T3-35). Pictures were taken of Mr. J.D.'s injuries on the day of the raid. He had abrasions on his back which he testified were caused by an officer's boot marks (T3-51; Exhibits 61, UUUU, TTTT, ZZZZ). Mr. J.D. testified he observed Sgt. O'Neil following the frisk who he described as having a "proud papa" look for what his officers accomplished during the raid (T3-37). 
Portions of Mr. J.D.'s testimony were corroborated by Pablo Dones, who testified that he saw and heard Officer O'Neil punching Mr. J.D. in a bathroom stall and kicking him because he could not urinate (T1-106, 135-137). Mr. Dones also testified that Mr. J.D. was crying out in pain after being hit several times and that CO Duncan witnessed the assault but did nothing to intervene (T1-106, 136-137). Additionally, Ricardo Moore testified that he overheard the loud assault on Mr. J.D. (T1-401), while Keith Gates testified that he observed officers using Mr. J.D. "as a trampoline" by jumping on his back (T1-470). Matthew Petrillo also corroborated Mr. J.D.'s testimony, stating that he saw an officer step on his hand and forearm, causing him to scream in pain (T1-618).
During the raid, Mr. J.D. testified officers destroyed his light, hotpot, fan, radio, packaged food, and personal clothing (T3-53). He did not recall whether he appealed the denial of his property claim (T3-105-106). He also testified that after being punched and kicked approximately 45 times on his legs, back, ribs, and head, he was evaluated by medical staff. Despite the extensive physical assault, the only injuries noted in his medical report were "three scratches to [his] upper back with abrasions" (Exhibits TTTT, ZZZZ; T3-106). Mr. J.D. explained that his back and chest were in extreme pain, making it difficult for him to breathe, and that his arms were limp and painful for days (T3-52). However, he did not mention any of these injuries to medical staff.
Mr. J.D. testified that initially medical staff was told that he "slipped on cornflakes" and landed on a pair of boots but this was not documented in the official records (T3-42, 44). Instead, his Inmate Injury Report, signed on July 6, 2016, stated that he "slipped and fell in the commotion" (T3-49-50, 82; Exhibits TTTT, UUUU). Mr. J.D. later drafted a memorandum stating that his report of being assaulted by staff was fabricated, but he testified that this memorandum and the Injury Report were written under duress (T3-44-46, 80-81).
SOLOMON HALL
Claimant Solomon Hall testified that on the morning of the raid while lying on the floor, an officer kicked him in the ribs, and another officer went through his locker, emptying its contents and pouring powder and coffee on him (T3-126-127). Mr. Hall was kicked in the ribs twice, and an officer placed a boot on his face for approximately 1.5 minutes (T3-128-129). Afterward, while standing against the wall, Mr. Hall was punched twice in the ribs (T3-130-131). He testified officers also destroyed his pictures, radio, fan, lamp, personal mail, coffee, Kool-Aid, chips, and cookies (T3-136).
Mr. Hall testified that when officers entered the room, they used racial slurs, and although he was kicked twice in the ribs, the kicks were not forceful enough to cause serious injury (T3-126, 128-129, 137). He did not remember which side he was kicked on and noted that the officer's boot on his face did not result in injury (T3-127-129, 138). Similarly, the punches to his ribs caused him pain for about a week or two, but no lasting injury (T3-130-131, 137-138). Mr. [*21]Hall also stated that he did not have documentation of his property claim denial (T3-150).
GREGORY PEARSALL
Claimant Gregory Pearsall testified that on the morning of the raid a group of officers entered the room, walked on him "like a carpet", kicked him in the legs, and threw things around the room, hitting him with a can in the process (T3-160-161). Mr. Pearsall further testified that he was punched in the face twice, kicked, and choked from behind when he tried to block a strike (T3-161). At another point, an officer grabbed him by the neck and threw him against the wall, causing his head to hit the wall (T3-167). Officers also destroyed his food, family photos, and treasured letters from his deceased parents (T3-165).
Portions of Pearsall's testimony was corroborated by Lenard Cox, who testified that he saw an officer punch Mr. Pearsall. Mr. Cox heard Mr. Pearsall ask the officers "you think it's funny (inaudible) picking on an old man" (T1-670-671). Alec Hammond testified that he saw an officer strike Mr. Pearsall to the ground. Mr. Hammond also heard Mr. Pearsall say, "I'm an old man" (T2-243). Mr. Pearsall also noted that he was on the floor for about half an hour and that his nose and head were bleeding after being thrown against the wall (T3-164, 167). He did not recall whether he filed an appeal of his property claim (T3-174).
ALEX ROBLES
Claimant Luis (Alex) Robles testified that on the morning of the raid officers punched and kicked him numerous times all over the backside of his body, treating him like a "punching bag" (T3-184-185). He could not recall the exact number of blows but stated that every officer who passed him was kicking or punching him (T3-185). He was then dragged to another location, thrown to the floor, and again punched and kicked multiple times (T3-187-189). Officers also broke Mr. Robles' radio and opened his food (T3-189). After being dragged to his room by two officers, he was thrown to the floor and again punched and kicked, focusing on his back and ribs but not his face (T3-186, 189). Mr. Robles estimated that he was punched and kicked more than 15 times in both the dayroom and his room (T3-198). He also did not file a property claim. (T3-200).
R.B.
At the time of trial, R.B. had passed away, and his mother, V.G., was appointed as the administrator of his estate and substituted as a claimant in the case. During the trial, the transcript of Mr. R.B.'s testimony during his examination before trial was admitted into evidence as claimant's Exhibit 85 without objection.
In his deposition, Mr. R.B. testified that several supervisory personnel, including Sgt. O'Neil, a couple of lieutenants, a captain, the superintendent, and the deputy of security, were present during the search on July 6, 2016 (Exhibit 85, p. 17-18). While Mr. R.B. was lying on the floor, several officers emptied his locker and poured shampoo, food, and coffee on him (id., p. 18-19). He was then kicked in the head and ribs, and a locker was dropped on him (id., p. 20-21). Mr. R.B. further testified that he was dragged from underneath the locker, causing his pants to come down, and an officer inserted a metal object into his rectum while saying, "How does it feel to be helpless, cock sucker?" (id., p. 24). Mr. R.B. also testified that all of his personal property was destroyed, including his lamp, fan, radio, sneakers, sweat suits, tobacco, and commissary items (id., p. 62).
Portions of Mr. R.B.'s testimony was corroborated by Pablo Dones, who testified that he recognized Mr. R.B.'s voice and heard him screaming from the room opposite his own, asking the officers why they were sticking an object in his anus (T1-95-97). Cole Bryant also corroborated Mr. R.B.'s testimony, stating that while lying next to Mr. R.B., he heard officers "getting physical" with him and heard him gasping (T1-329). Mr. Bryant further testified that he heard an officer say to Mr. R.B., "This is what it feels like to be helpless" (T1-304). Michael Russell testified that he heard Mr. R.B. yelling "no" and "stop" and screaming in pain (T1-984-985). Additionally, Jeremiah Williams testified that he observed officers punching and kicking Mr. R.B. and tipping a locker onto him (T1-725).
OFFICERS' TESTIMONY
DANIEL O'NEIL
Daniel O'Neil appeared for his testimony in shorts and a polo shirt, more suited for a round of golf than for testifying in a judicial proceeding. His demeanor throughout his testimony was marked by utter disdain, arrogance, and condescension, all of which reflected a blatant lack of respect for the court and the process. Mr. O'Neil testified that he is now retired but worked as a sergeant at Mid-State CF in 2016. He stated that he received a notice of discipline related to the raid (T2-6-7). As a result, Mr. O'Neil was suspended for two months and placed on 18 months of probation (T2-12-13). He testified that his responsibilities as a sergeant included supervising the officers under his command (T2-14). Mr. O'Neil claimed that he did not witness any officers throwing chairs into the walls during the raid, nor did he hear any officers use derogatory language (T2-17, 19-21).
Mr. O'Neil testified that on July 3, 2016 he was working Tour 3 at Mid-State CF (T2-25). At some point during the day, the Personal Alarm System for the officer assigned to Unit 4H was triggered (T2-26-27). Mr. O'Neil responded to Unit 4H with three to four other officers. He instructed the incarcerated individuals to return to their bed areas as part of the count procedure. He then ordered the officers to search Unit 4H for a weapon because Officer Kahl had sustained a cut on his head (T2-28). Mr. O'Neil testified that no weapon was found on July 3, 2016.
In the days leading up to July 6, 2016, Mr. O'Neil formed the impression that Officer Kahl had either slipped and fallen or had been assaulted, though he was not permitted to investigate further (T2-29-30). He also testified that it was possible a weapon was present in the unit, and such a possibility would justify a full, thorough frisk of the 4H dormitory (T2-31).
Mr. O'Neil reported to work around 6 a.m. on the morning of July 6. He informed the watch commander of his arrival and was assigned to conduct a frisk of Unit 4H that morning (T2-32). Mr. O'Neil testified that it was his understanding at the time that Officer Kahl had either slipped and fallen or had been assaulted by incarcerated individuals in the Unit 4H. The purpose of the raid that day was to locate any weapons within the unit (T2-34). The watch commander that morning was Lt. Surprenant. The goal of the frisk was to search for dangerous contraband, including weapons (T2-35-36). Mr. O'Neil further testified that he did not initially connect the search for weapons on July 6 with the incident involving Officer Kahl on July 3 (T2-36-39). After receiving the assignment from the watch commander, he gathered the necessary equipment for the search and held a meeting in the line-up room with the team that would conduct the frisk (T2-39-40). He stated that Lt. Hebble addressed the officers during this meeting, though Mr. O'Neil could not recall speaking to the officers himself. He testified that approximately 20 officers were present at this meeting.
When confronted with his deposition testimony, Mr. O'Neil appeared to have a clearer recollection of the meeting in the line-up room with his team of assembled officers. During his direct examination, he was asked the following questions and gave the following answers, which were read back to him:
Q: Did they explain at all what the purpose of the dorm frisk was?
A: No. They were not happy that we were frisking, where frisking officers are getting cut, or possibly got hit. We wanted to make sure if there's weapons in there, we want to get them.
Q: Now, I may have not heard you clearly, did you say that officers are getting cut, or hit, or were they talking specifically about Officer Kahl?
A: Yeah, I believe they were talking about Officer Kahl. I can't give you a quote of what exactly they said, but they didn't want another officer to get cut or hit.
(T2-43).
Mr. O'Neil was then asked:
Q: Did you give those answers to those questions at your deposition?
A: That was when, and where?
Q: The deposition?
A: Yeah.
(T2-43-44).
Mr. O'Neil's trial testimony was inconsistent with his deposition testimony regarding the line-up meeting. At trial, he testified that Officer Kahl's injuries were not discussed during the line-up meeting (T2-47). He further testified that the officers assigned to the frisk that morning were simply doing their jobs and following instructions (T2-48). Mr. O'Neil discussed the frisk with the Superintendent prior to its commencement. The Superintendent wanted a "very thorough frisk", with instructions to look at everything and "turn everything upside down". Mr. O'Neil recalled the Superintendent saying that if there was a weapon, he wanted it found. Additionally, Mr. O'Neil spoke to DSS Corey that morning (T2-49).
Mr. O'Neil testified that he and Lt. Hebble were tasked with overseeing the frisk, though other supervisors, including the superintendent, DSS Corey, and DSP Joslyn, were present throughout the day (T2-56). Mr. O'Neil's son, Officer Ryan O'Neil, was also assigned to the raid that morning (T2-56). Mr. O'Neil testified that the officers arrived at Unit 4H that morning by bus and van. He, Lt. Hebble, and Lt. Surpenant were the supervisors overseeing the raid. Mr. O'Neil stated that Lt. Hebble was at the back of the line, bringing up the equipment, while he led the group of officers into the dormitory, with everyone following his directions. Mr. O'Neil further testified that he had no concerns about the safety of the incarcerated individuals, despite at least some officers being aware of what had happened to Officer Kahl.
Mr. O'Neil was then confronted with his prior deposition testimony, in which he was asked the following questions and provided the following answers:
Q: Did you say anything to Lt. Hebble about how maybe you should inform the officers that an officer had just been assaulted, and now you're sending COs to go look for the weapon that was potentially used in the assault?
A: I'm not understanding what you're saying.
Q: Were you concerned, at all, that the officers might not have been informed about the incident with Officer Kahl?
A: No. I would have been concerned if they were told.
Q: Why would you have been concerned if they were told?
A: Because you don't tell the officers that these incarcerated individuals just assaulted one of your officers. You don't tell them that.
Q: Why not?
A: Because bad things can happen.
Q: What do you mean by that?
A: It means you could have a problem. You could have guys with attitudes.
Q: What kind of attitudes?
A: Like, angry, that one of their co-workers got assaulted by an [incarcerated individual]. You don't know. You don't talk about it. You don't say that kind of stuff. It's not in writing. You don't talk about that stuff.
(T2-63).
Then at trial, Mr. O'Neil was asked the following:
Q: Did you give those answers to those questions?
A: Yes.
Q: And, so, based on your prior testimony here today, when you testified that at least some of the officers knew about what happened to Officer Kahl, was it foreseeable to you that bad things can happen?
A: No.
(id.).
Mr. O'Neil testified that he was not initially present when the officers began administering the collection of urine samples. He explained the general procedure for obtaining a urine sample: an officer would escort the incarcerated individual into a bathroom, where the [*22]individual would be instructed to provide a urine sample in a container. A form would be filled out, and the sample would be sealed in front of the incarcerated individual, with all necessary information placed on the seal. The sample would then be stored securely with the others. Mr. O'Neil noted that it is possible for individuals to hear what is happening from one stall to another.
Mr. O'Neil reiterated that the primary purpose of the raid was to search for weapons, and he was uncertain who initially requested that urine samples be taken from all the incarcerated individuals. He later clarified that he was, in fact, present at the beginning of the administration of the urine samples and that Lt. Hebble had given the order (T2-64-68). Further discussing the procedure for collecting urine samples, Mr. O'Neil testified that an officer must escort the incarcerated individual into a stall and physically observe the individual producing the urine to confirm that the sample is coming from the correct person. The officer must be in close proximity to ensure the sample is properly collected. Mr. O'Neil also testified that during the course of the investigation, he learned that Mr. J.D. had accused his son, Officer O'Neil, of flicking his penis to make him urinate. Mr. O'Neil stated that, to his knowledge, his son did not derive any gratification from observing naked men or from touching male genitalia (T2-70-71).
On cross-examination, Mr. O'Neil went into greater detail about the raid. He testified that he was positioned in various areas up and down the hallway throughout the dorm. At some point, he observed incarcerated individuals splayed out on the floor and testified that in his entire career, he had never seen anything like that: "I didn't know why [incarcerated individuals] were on the floor" (T2-74). Mr. O'Neil also testified that the officers were wearing nametags and that he did not observe any property damage during his rounds that day. However, he later observed a chair sticking out of the wall and was directed by one of the captains to take it down, though he did not know how it had gotten there (T2-73-77).
The following additional portion of Mr. O'Neil's deposition testimony was then read to him during the trial regarding the incident involving Officer Kahl:
Q: So, at that point was it your impression that they believed that Officer Kahl was assaulted by an [incarcerated individual]?
A: No. I had no idea what happened to him. There was an investigation going on.
Q: But I'm asking, did it appear to you that the supervisory staff that you were speaking with, they believed that Officer Kahl was attacked by an [incarcerated individual]?
A: I couldn't tell you what they thought. All I know is what I thought.
Q: Okay, but just to be clear, you were told that the 4H Dorm was being frisked for weapons in an attempt to find a potential weapon that was used against Officer Kahl.
A: No, I did not. I was not told that, no.
Q: Was it ever explained to you that this frisk of the 4H Dorm was happening because of the incident that occurred with Officer Kahl?
A: No, it was not.
(T2-81).
Then counsel asked Mr. O'Neil the following, "Do you recall being asked those questions and providing those answers", to which Mr. O'Neil answered "Yes" (id.).
Mr. O'Neil testified that no incarcerated individuals were threatened or discouraged from going to medical.
RYAN O'NEIL
Ryan O'Neil testified that he has been assigned to Mid-State CF since 2015. In July 2016, Officer O'Neil was working as a resource officer. He claimed that he did not know anything about the incident involving Officer Kahl on July 3, 2016 prior to the July 6, 2016 raid, and only learned about it days after the frisk (T2-118-122). On July 6, he was assigned to participate in the frisk of the 4H dorm. He testified that he attended the line-up that morning but did not recall who spoke. After having his recollection refreshed, he did remember that his father, Sgt. O'Neil, had spoken at the line-up (T2-122-124; Exhibit 42). Officer O'Neil had a poor recollection of what was said that morning, but when confronted with his prior transcript, he testified that Sgt. O'Neil [*23]had informed them they would be conducting a thorough frisk of the unit and that they were looking for a weapon. Despite this, it did not help refresh the witness's overall recollection (T2-125). Similarly, Officer O'Neil had no recollection of any instructions being given on the bus prior to the raid. However, when confronted with his previous transcript, he testified that Sgt. O'Neil had reiterated the need for a thorough frisk. Officer O'Neil claimed he did not know why 4H was singled out for the frisk on the morning of July 6, 2016 and stated that no officer, either at the line-up or on the bus, mentioned the events connected to Unit 4H on July 3, 2016 involving Officer Kahl. He testified that he later learned Officer Kahl had been seriously injured, but only after the raid had taken place (T2-126-128). Officer O'Neil further testified that throughout the frisk, he had no recollection of Officer Kahl's injury. He stated that nobody questioned why they were focusing on the 4H dorm, and his father never mentioned the reason for searching 4H that day (T2-122-128).
Officer O'Neil testified that when he entered Unit 4H, he did not make any observations and was unaware of what the other officers were doing at the time. As he passed through the dormitory, he did not observe any actions by the COs. His testimony was that he was looking straight ahead, observing nothing in front of him and nothing to the right or left (T2-131-133). Officer O'Neil further testified that he did not see any chairs being thrown against the walls, any lockers being thrown to the ground, any beds being turned over, or any food or other items being thrown around. He also did not witness any incarcerated individuals being kicked, punched, or assaulted in any way. Additionally, he stated that he did not hear any racial vulgarities that morning (T2-133).
At some point during the raid, Officer O'Neil was instructed to take urine samples from the incarcerated individuals. He did not recall who gave him the instruction, but he believed his father, Sgt. O'Neil, was still present when he received it. Officer O'Neil testified that he believed Sgt. O'Neil was present throughout the entire dorm search, which he estimated lasted a couple of hours (T2-137-140). Officer O'Neil stated that he was simply performing his duties when he began taking the urine samples. He further testified that, had a supervisor not instructed him to take the samples, he would not have done so. He also noted that he had taken urine samples on previous occasions. According to his testimony, there is no formal training for collecting urine samples; rather, "you're basically taught by another officer" (T2-140-141).
Officer O'Neil testified regarding the procedure for collecting urine samples:
You are given a urinalysis request, test request form, and you get a sealed cup. You will bring whatever incarcerated individual that's on that paperwork. You inform him of the reason for the urinalysis request test. You have him open the cup to ensure that it is sealed. From there, you take him to a toilet so he can urinate into the cup. He will hand you the cup back, and you will close the lid of that cup, let the person wash their hands, clean themselves, then you would bring the urinalysis cup to a secure lockbox.
(T2-141-142).
Officer O'Neil testified that on July 6, he was assigned to find a particular incarcerated individual to take a urine sample. He had previously referred to this task as "find the con", using a slang term in prison for a convicted felon. However, he testified that he no longer refers to incarcerated individuals as "cons", noting that they are now referred to as "incarcerated individuals" (T2-142). Officer O'Neil stated that he did not view referring to incarcerated individuals as "convicts" as derogatory (T2-143). He emphatically denied ever using racial slurs when referring to incarcerated individuals. Officer O'Neil also testified that he did not remember the names of any of the incarcerated individuals from whom he took urine samples. He stated that the first time he heard about J.D.'s claim that he flicked his penis was from his lawyer. Furthermore, Officer O'Neil testified that, in July 2016, he did not receive any sexual gratification from observing naked men or touching genitalia (T2-147).
On cross-examination, Officer O'Neil testified that he was not disciplined for the incident (T2-147). He also stated that none of the officers had their name tags removed. Officer O'Neil testified that he did not witness any use of force against any particular incarcerated individual on [*24]that day (T2-148). Additionally, he testified that he did not hear any officers or supervisory staff threaten or make any type of threats against the incarcerated individuals (T2-149).
RONALD HEBBLE
Ronald Hebble testified that he has been employed at DOCCS for 25 years as a Corrections Lieutenant at the time of trial (T3-222). He was employed at Mid-State CF on July 6, 2016 and participated in the dorm frisk that occurred around 8:00 a.m. that day. Prior to the dorm frisk, he was in the watch commander's office throughout the morning with other members of the facility's executive team, including DSS Corey, the Superintendent, and the watch commander. They were given instructions regarding the dorm frisk. DSS Corey explained that he wanted a thorough search conducted because of a possible incident that had occurred a few days prior. DSS Corey further explained that interviews and urinalysis testing would be conducted, and he emphasized that the dorm frisk should be carried out completely and thoroughly (T3-225).
Lt. Hebble testified that, two days prior, an officer had been injured on the unit. He stated they were unsure whether the injury was the result of an accident or an assault. He confirmed that he spoke with Sgt. O'Neil that morning, whom he characterized as a seasoned sergeant. He further testified that Sgt. O'Neil was responsible for running the frisk with the staff and was in charge of the staff that morning. Sgt. Crowe later arrived to assist (T3-225-229).
Lt. Hebble testified that the lineup room is approximately a quarter mile from Unit 4H and that they needed to take a bus to reach 4H on the morning of the raid. He explained that the bus pulled up to the front of Building Four, and that is when the staff and the Sergeant disembarked and proceeded to the unit. He testified that there were approximately 20 COs and staff members present that morning. Lt. Hebble further stated that the Sgt. O'Neil led the officers into the unit first (T3-230-231).
Lt. Hebble testified that upon arriving in Unit 4H, Sgt. O'Neil informed him they had a use-of-force incident involving one of the incarcerated individuals. At that time, Lt. Hebble was transporting the Cellsense equipment, which is essentially a magnetometer, up to the unit (T3-229).
During his rounds that day, Lt. Hebble did not observe anything out of the ordinary. He testified that he did not use force against any incarcerated individual, nor did he witness any staff employing force. Additionally, he stated that he did not destroy or witness the destruction of any State property or incarcerated individuals' property. He did not notice that any property, either the State's nor an incarcerated individual's was damaged when he performed rounds that day. Lt. Hebble testified that he did not confiscate any incarcerated individual's property, did not hear any derogatory racial language, and did not hear any staff making threats toward incarcerated individuals. He confirmed that all officers wore their name tags during the raid (T3-240-243).
Lt. Hebble testified that this particular dorm frisk was different from others he had participated in because it followed a possible serious assault on an officer, the circumstances of which were still unclear. He explained that the purpose of the search was to possibly find a weapon or other evidence related to the incident, as they were still trying to determine what had happened (T3-243-244). Lt. Hebble further testified that, during the morning briefing, there were references to the search being intended to "send a message" to the incarcerated individuals (T3-244). He interpreted this as a way of letting them know that the staff was present, taking the situation seriously, and would thoroughly search their belongings until they could figure out what had occurred. He clarified that "sending a message" did not imply that officers would be placing hands on the incarcerated individuals during this particular incident (T3-243-244).
Lt. Hebble testified that he received disciplinary action as a result of the raid and was placed on administrative leave, a decision he accepted because he did not want to jeopardize his family or his job. When asked about the reasons for the disciplinary action, he testified that it was due to damage to State property and paperwork inconsistencies. Regarding the damage, he believed it involved lockers and a telephone. He stated that, at no point during the frisk, was he advised by anyone that damage had occurred. He also testified that he did not observe any damage to the walls during his rounds. His understanding of the telephone damage was that the [*25]cord had been ripped (T3-244-248).
On cross-examination, Lt. Hebble clarified that he pled guilty to the disciplinary findings against him (T3-256). He testified that during his rounds, he did not see a chair sticking out of the wall, although he did notice some holes in the wall but thought nothing of them. When shown Exhibit 6, page 36, he acknowledged that the holes in the wall could have been caused by the legs of chairs (T3-260-261). He further testified that if he had noticed the holes in the walls that day, it would have been his responsibility to question it and try to find out how it happened (T3-264-265). Lt. Hebble stated that he only found out days or weeks later that a chair had been stuck in the wall (T3-265).
Lt. Hebble also testified that he was aware of the concept of the "blue wall of silence" within CFs among security staff but was not aware of such a practice specifically at Mid-State CF (T3-267). On July 3, Lt. Hebble was the midnight watch commander and understood that the incident involving Officer Kahl had occurred earlier in the day, and the OSI was already investigating the matter. To this day, he does not know whether Officer Kahl was assaulted or fell out of a chair (T3-272-273).
Lt. Hebble testified that the purpose of the search during the July 6 raid was partly due to the possibility that Officer Kahl had been assaulted by an incarcerated individual, and they wanted to find evidence, such as weapons or bloody clothing, to help determine what had occurred (T3-274). He further testified that an officer assault would be considered "a grave concern" by senior staff and would be relayed to security staff (T3-274-275).
Lt. Hebble testified that an officer assault by an incarcerated individual is not something that would be kept from COs. At every lineup unusual incidents would be discussed, and by the night of July 4, staff would have already known about the possible incident involving Officer Kahl. Lt. Hebble further testified that this "grave concern" would have been relayed to the COs attending the July 6 lineup before the raid (T3-274-275).
Although Lt. Hebble claimed that on the morning of July 6, none of the rank-and-file COs appeared agitated about the possibility that one of their fellow officers had been assaulted by an incarcerated individual (T-278), he testified that between the July 3 incident involving Officer Kahl and the July 6 raid, the rank-and-file officers had a "cooling off" period (T-280-281).
Lt. Hebble also testified that tipping lockers over during a search was standard protocol (T-325). He also testified that it was not unusual for there to be liquid on the floor after a unit search (T-357-358). He testified that you attempt to put all the property on the bed during a frisk, if it fits, but sometimes stuff falls off on the floor (T3-326). He further testified that taking urine samples from incarcerated individuals was a normal part of a dorm search, and that Directive 4937 instructs staff on proper procedure for doing so (T3-334-335). Lt. Hebble stated that when senior officials ("the brass") came in during the search, "they had no problem with what had happened" (T3-353). He also testified that he saw the Superintendent in the housing unit during the dorm search, and the Superintendent told him, "good job" (T-333, 354).
FRANK DARE
Officer Frank Dare, a CO at Mid-State CF, participated in the dorm frisk on the morning of July 6 (T3-362). He testified that he had not previously participated in any dorm frisks and did not recall how many officers were present in the lineup room that morning (T3-363). Officer Dare stated that he had no independent knowledge of why the dorm was being frisked that day. He testified that he was responsible for carrying the metal detector to the dorm (T3-364).
Officer Dare testified that he did not witness any use of force and did not participate in any use of force that morning (T3-364-368). He did not observe any damage to State property, did not destroy any property belonging to incarcerated individuals, and did not witness other officers causing damage. Specifically, he did not see any damage to the television or telephone (T3-369).
Officer Dare further testified that he did not find any contraband that morning and did not use any racial slurs, nor did he hear any staff members make threats to any incarcerated individual (T33-370). He confirmed that both he and the other officers were wearing their name [*26]tags (T3-371). Officer Dare also stated that he had no information regarding Officer Kahl being injured and heard no discussions from other officers about the injury (T3-374).
CHRISTOPHER HAYES
Officer Christopher Hayes, a CO at Mid-State CF, participated in the dorm frisk of Unit 4H on July 6 (T3-386). He testified that during the lineup that morning, the only information provided was that they would be frisking the 4H dorm (T3-388). He stated that the supervisors did not provide any specific purpose for the search. While on the bus to 4H, the only instruction he received was that it would be a standard frisk, as usual (T3-387-389).
Officer Hayes testified that upon entering the dorm, he worked his way down the hallway, pulling incarcerated individuals out into the hall. He stated that the individuals got on the floor without seeming surprised (T3-390-391). He further testified that no significant contraband was found during the search (T3-393).
Officer Hayes stated that he did not use force against any incarcerated individuals, nor did he witness any fellow staff members using force (T3-395). He also testified that he did not destroy any property or observe any damage to State property, though he did notice a few holes in the walls, which he described as nothing substantial (T3-395).
According to Officer Hayes, the dorm appeared disheveled after the raid (T3-398). He testified that he did not hear any staff members use racial slurs or threats against the incarcerated individuals (T3-399). Officer Hayes acknowledged that he had been disciplined for falsifying documentation prior to the dorm search (T3-401).
DONALD SLAWSON
Sgt. Donald Slawson, a CO at Mid-State CF, participated in the dorm frisk of Unit 4H on July 6 (T3-437). He testified that he went to the dorm that morning to pick up a "convict" for an investigation (T3-437). Sgt. Slawson estimated that there were about 20 to 25 officers in the lineup room that morning, as well as several supervisors, including Sgt. O'Neil (T3-457-458). He testified that Sgt. O'Neil did not address the entire group, and he did not recall any instructions given to the group as a whole (T3-459). During the lineup that morning, he received instructions to pick up one of the incarcerated individuals from the dorm (T3-438). Sgt. Slawson testified that approximately 30 officers participated in the raid (T3-439). He stated that he did not know the reason for the dorm being frisked, remarking, "I don't ask questions, you're better off" (T3-439).
The Court admonished Sgt. Slawson during his testimony because he repeatedly referred to the claimants as "convicts." He was directed by the Court to use "claimants" or "incarcerated individuals" instead (T3-441). Sgt. Slawson testified that when he entered Unit 4H, he went into the bathroom with CO Adam Joseph. He stated that one of the incarcerated individuals attempted to leave the bathroom, prompting Sgt. Slawson to tackle him to the floor (T3-443). He testified that the only use of force he employed were body holds (T3-444). After the incident, he did not notice any injuries to the incarcerated individual, and no complaints of injury were made to him (T3-449). Sgt. Slawson further testified that he was not disciplined in any way as a result of his use of force (T3-449).
On cross-examination, Sgt. Slawson testified that he was familiar with the proper procedures for using force, stating that only the force necessary under the circumstances should be used (T3-450-451). He further testified that when a use of force incident concludes, a sergeant or supervisor should be called to the scene. At that point, the individuals involved in the use of force are required to leave the scene so that a fresh set of officers can take custody of the incarcerated individual and escort them to their destination (T3-451). However, he noted that it is not always possible to have a fresh set of officers available to perform the escort (T3-451).
Sgt. Slawson further testified that Sgt. O'Neil had told him that their task that day was to pick up Mr. Bowers for an investigation, which was his only assignment for that day (T3-461). He stated that he was on the CERT team with Sgt. O'Neil and that Sgt. O'Neil typically called on CERT members to handle such tasks. He testified he doesn't question his supervisors, "they tell you to do something, I do it" (T3-462). Sgt. Slawson testified that Mr. Bowers, the incarcerated individual involved in the incident, had long dreadlocks (T3-452-453). He stated that he and CO [*27]Joseph, the other officer involved in the use of force, escorted Mr. Bowers out of the dormitory to the Special Housing Unit (SHU) (T3-452-453).
Sgt. Slawson also testified that he was unaware that Officer Kahl had been injured three days earlier (T3-469). Throughout his testimony, Sgt. Slawson was evasive and exhibited disdain for the process, responding in a condescending manner and offering answers that were unresponsive to the question being asked. He reviewed a picture of Mr. Bowers taken after the incident, identified him, and noted swelling under Mr. Bowers' eye. However, he testified that on July 6, he did not observe any injury to Mr. Bowers, including no bruising on his back (T3-479-480).
ADAM JOSEPH
Officer Adam Joseph, a CO at Mid-State CF, was employed there on July 6, 2016 and participated in the raid (T3-492-493). The bus headed to Unit 4H stopped midway to pick him up (T3-494). Officer Joseph testified that there were supervisory staff on the bus, including Lt. Hebble, Sgt. O'Neil, and Lt. Surpenant (T3-495). Upon boarding the bus, he was given specific instructions by Sgt. O'Neil, who showed him a picture of Mr. Bowers and directed him to collect and escort Mr. Bowers to the SHU for investigation (T3-495).
Officer Joseph testified that upon entering Unit 4H, he went into the bathrooms to clear them, where he encountered Mr. Bowers (T3-497). He was with Officer Slawson at the time (T3-498). Upon entering the bathroom, Officer Joseph gave Mr. Bowers instructions to put his hands on the wall, but Mr. Bowers disregarded the instruction. Officer Joseph testified that Mr. Bowers then rushed at him, striking him in the shoulder and chest area, knocking him to the ground. He further testified that Officer Slawson came over, and together they struggled with Mr. Bowers on the floor until they subdued and handcuffed him. During the struggle, Mr. Bowers hit the floor (T-498-499).
After subduing Mr. Bowers, they escorted him off the unit to a van and then to the SHU. Officer Joseph testified that it is not typically standard protocol for officers involved in using force against an incarcerated individual to escort that individual following the altercation (T3-501). Officer Joseph explained his understanding of why the 4H dorm was being frisked that day. He testified that while on the bus, a supervisor mentioned keeping an eye out for weapons, as there had apparently been a prior staff assault on the unit, which he believed was the reason for the frisk (T3-502). He further testified that he believed Mr. Bowers was being removed from the dorm to be investigated in connection with the incident that led to the frisk (T3-502). After escorting Mr. Bowers to the SHU, Officer Joseph returned to 4H because they called for the urinalysis box (T3-504).
Officer Joseph testified that he did not notice any injuries to Mr. Bowers following the use of force. He stated that he had no specific recollection of Mr. Bowers beyond the fact that he was a black man with dreadlocks (T3-504). Officer Joseph was not disciplined for the use of force (T3-505-506).
On cross-examination, Officer Joseph testified that he was part of Sgt. O'Neil's CERT team. He was specifically asked about the purpose of the frisk and provided the following testimony:
Q: You believe this whole frisk was about what happened to Officer Kahl, right?
A: I believe that was part of it, yes, and 
Q: And you talked to other staff members about that, as well, right?
A: Yes.
(T3-522-523).
CHRISTOPHER HERRING
Officer Christopher Herring, a CO at Mid-State CF with 28 years of experience working for DOCCS, was working at Mid-State on July 6, 2016 and participated in the dorm frisk that day (T3-530-531). He claimed not to have met with any other officers prior to the frisk (T3-531). When asked if he was aware that an officer had possibly been assaulted a few days earlier, Officer Herring testified that he was not aware (T3-532).
Upon arriving at the 4H dorm, Officer Herring stated that he did not receive any instructions or speak with any supervisory staff (T3-532). He testified that he proceeded to the back of 4H and followed his normal procedure for a frisk (T3-533). Officer Herring further testified that he did not find any contraband and was not provided with any specific instructions regarding items to look for during the search. He also confirmed that he did not discard any property belonging to incarcerated individuals that day (T3-538).
Officer Herring testified that during the dorm frisk, he did not use any force against any incarcerated individuals and did not witness any uses of force by other staff (T3-540-541). He stated that he did not destroy any State property, did not use a fire extinguisher to break a lock on a locker, and did not witness any other staff destroy State property or property belonging to incarcerated individuals (T3-540-541). He did not observe any holes in the walls of the dorm or see any damaged lockers that morning (T3-540-541). Nothing about the appearance of the dorm stood out to him after the frisk.
Officer Herring also testified that he did not use any racial slurs, nor did he hear any staff members use racial slurs against the incarcerated individuals (T3-542). He further stated that he did not make any threats or hear any other officers make threats toward the incarcerated individuals. Officer Herring confirmed that he was wearing his name tag during the search (T3-542-543).
On cross-examination, Officer Herring was asked about claimant Tony King, because Officer Herring had searched one of the cubicles, which belonged to Mr. King. Claimants' counsel questioned Officer Herring regarding Mr. King's testimony that he couldn't get on the floor fast enough and that someone kicked him in the head. At this point, the Court noted that Officer Herring snickered. Claimants' counsel asked Officer Herring if he found the situation funny, to which Officer Herring responded that he did not. When claimants' counsel pressed further, asking why he had laughed, Officer Herring testified, "I'm not laughing". When asked again why he snickered, Officer Herring responded, "I find the claim to be really hard to believe". When asked which claim he was referring to, Officer Herring clarified, "that he was kicked or otherwise anything, Mr. King" (T3-549). Officer Herring was shown pictures of damage to Mr. King's room during cross-examination and testified that he did not see any hole in the wall when he was there (T3-550-551; Exhibit 6, p. 91, 94). He also testified that he did not see any holes in the walls anywhere in the dorm that would indicate that the legs of chairs had been thrown into the walls (T3-551-552).
VINCENT SULLIVAN
Officer Vincent Sullivan, a CO at Mid-State CF with 16 years of experience at DOCCS, testified that he was working at Mid-State on July 6 and participated in the dorm frisk of Unit 4H (T3-561). He drove the bus to the dorm that morning and reported to the lineup room (T3-562). Officer Sullivan testified that he was not provided any information or direction from supervisory staff regarding the dorm frisk while in the lineup room, and he could not recall any supervisors present (T3-563). He approximated that he had participated in about 20 previous dorm frisks.
Officer Sullivan's understanding of why the dorm was being frisked that day was that an officer had been assaulted two days earlier, and they were searching for weapons (T3-565). Officer Sullivan testified that he did not find any contraband that morning and did not utilize any force on incarcerated individuals, nor did he witness any force being used by fellow staff members (T3-567, 570). He further testified that he did not destroy any State property and did not observe any other staff members destroying State property. Although he did not notice any holes in the walls on July 6, he claimed to have noticed holes in the walls prior to that date (T3-571-572).
Officer Sullivan stated that while the dorm was messy after the search, nothing in particular stood out about the dorm frisk (T3-573). He testified that he did not direct any racial slurs toward incarcerated individuals, nor did he hear any staff members use racial slurs or threats toward the incarcerated individuals that day (T3-573-574).
On cross-examination, Officer Sullivan testified that prior to July 6, he learned about [*28]Officer Kahl being injured. He became aware of the incident on July 3, when he responded to the 4H dorm during his tour of duty that evening, as he was a roundsman (T3-577). When he arrived at the 4H dorm on July 3, he observed a mess, and Officer Kahl was in his office with blood on the floor (T3-578). Officer Kahl was being attended to by security at that point (T3-579).
Officer Sullivan was asked whether he believed Officer Kahl had been assaulted by incarcerated individuals and testified that he did, and he did not change his opinion about how Officer Kahl was injured after that. When he appeared at the lineup on July 6, he was still under the impression that Officer Kahl had been assaulted by incarcerated individuals in Unit 4H (T3-580). He testified that he still feels that way as of the date of his testimony at trial (T3-581).
Officer Sullivan further testified that between July 3 and July 6, he did not discuss his opinion about Officer Kahl being assaulted with other COs (T3-581). He stated that when he reported to work on the morning of July 6 and attended lineup, he did not discuss Officer Kahl's injury with anyone and did not inquire as to how he was doing, despite having last seen him bleeding from the head on the floor (T3-584). Officer Sullivan claimed not to have been curious about Officer Kahl's condition.
He testified, "I heard people talking", when asked if he heard others discussing what had happened to Officer Kahl (T3-584). He initially stated that he was not talking about it himself, but later elaborated and testified that he overheard other officers discussing it, though he claimed he didn't really know what they were saying (T3-584-585). Officer Sullivan then testified that the officers at the lineup, including those who were going to conduct the dorm frisk, were talking about Officer Kahl. When asked if it was a topic of conversation, he responded, "Probably, for most people" (T3-585). Prior to the raid, Officer Sullivan testified that officers were discussing Officer Kahl because it was the first time many of them were back together after the July 4th holiday (T3-585). Officer Sullivan stated that the officers were saying that Officer Kahl had been cut by an incarcerated individual. The following exchange occurred regarding the mood among the officers prior to the raid:
Q: That must've made them pretty angry. What do you think about that?
A: I would say yes.
Q: Who was the angriest?
A: I don't know.
Q: What about Sgt. O'Neil? Was he angry?
A: He was upset.
Q: Yeah. Any other supervisors there?
A: I recall, no.
Q: So, just Sgt. O'Neil, but was he more upset than the officers, or equally upset, or just 
THE COURT: Are you able to give an opinion, based on your awareness of Officer O - Sgt. O'Neil that morning, at how upset he was?
OFFICER SULLIVAN: My opinion?
THE COURT: Yeah.
OFFICER SULLIVAN: I believe everybody was very upset, but that's my opinion.
Q: And, you know, Officer Sullivan, that's based on - you were there. That's based on your observations of them, right?
A: Correct.
Q: You were upset, too, I bet, right?
A: I was.
(T3-586-587).
KENNETH SHORTT
Officer Shortt testified that he is a CO at Mid-State CF and has worked for DOCCS for 23 years (T3-599). Similar to the other officers, Officer Shortt testified that he did not destroy or damage any State or incarcerated individuals' property on the day of the dorm frisk, nor did he observe any of his fellow staff members doing so, although he did recall seeing maybe two or three lockers tipped over (T3-612-613). Officer Shortt further testified that he did not see any of [*29]his fellow staff members use a fire extinguisher to break a lock on a locker (T-613). He stated that the dorm was messy after the raid (T3-614).
Officer Shortt testified that he did not direct any racial slurs toward incarcerated individuals, nor did he hear any fellow staff members use racial slurs (T3-614). He also stated that he did not threaten any incarcerated individuals and was wearing his name tag during the frisk. Officer Shortt testified that he was disciplined as a result of the dorm frisk. He described his disciplinary action as related to a signature on certain frisk forms that were not his. He accepted the charges and was placed on probation (T3-617).
Officer Shortt testified on cross-examination that he was aware Officer Kahl had been injured prior to the dorm frisk (T3-625). However, he claimed he was not aware if Officer Kahl's injuries were discussed during the lineup before the raid (T3-626). Officer Shortt stated that he could not recall his thoughts about Officer Kahl being assaulted by incarcerated individuals at the time (T3-626). Officer Shortt was then asked about his Q&A from December 6, 2016. During that Q&A, he had been asked, "what the events or circumstances were, which caused the facility to frisk 4H on that day"? and had previously responded, "probably the assault of the officer" (T3-627). Officer Shortt testified that he was never informed that 27 lockers were broken during the dorm frisk and claimed not to have seen any damage to the walls during the raid (T3-632). When asked what steps he would have taken if he had seen an officer throw a chair into the wall, such as whether he would inform a sergeant, he responded, "No" (T3-634).
MICHAEL SURPRENANT
Lt. Michael Suprenant testified that he is a lieutenant at Mid-State CF and has worked for DOCCS for 25 years (T3-640). He was assigned as the watch commander during the July 6 raid on the 4H dorm (T3-641). As watch commander, he was essentially the shift commander, responsible for overseeing all activity within the facility during his shift (T3-641). He was made aware of the dorm frisk that morning by DSS Corey (T3-642). Lt. Suprenant testified that other supervisory staff, including Lt. Hebble and Sgt. O'Neil, were on the bus prior to the raid (T3-644). He further testified that he did not give any direction that morning, as Sgt. O'Neil was in charge of running the frisk (T3-644).
Lt. Suprenant explained that, in the rush to get to the dorm, the officers left the metal detector behind, so he and Lt. Hebble helped carry the equipment up to Unit 4H (T3-644-645). He testified that he arrived approximately five minutes after the other officers and, upon entering, saw an incarcerated individual in handcuffs being escorted out of the building by Sgt. O'Neil and a couple of officers. He understood that there had been an assault on staff and a use of force (T3-645).
Lt. Suprenant testified that he stayed in the dorm for approximately 10 minutes (T3-650). His understanding of the reason for the raid was that there was information suggesting an incarcerated individual may have assaulted Officer Kahl with a weapon, and the search was an attempt to find that weapon (T3-650). One thing that stood out to him during the frisk was that the incarcerated individuals were on the ground in a prone position, which is not standard protocol (T3-652). He testified that in this situation they were told there may be a weapon that was used to injure an officer, so they had a vested interest in finding it (T3-652).
During his time in the dorm, he testified that he did not observe any staff damaging State or incarcerated individuals' property, nor did he hear any racial slurs (T3-653). He did not return to Unit 4H until a few weeks later (T3-654). Lt. Suprenant confirmed that this process was what the Superintendent wanted (T3-654-655). On cross-examination, Lt. Suprenant testified that he became aware of an ongoing investigation prior to July 6 into why Officer Kahl was injured. Capt. Adamik informed him of the investigation on July 5 (T3-664-665). He testified that initially it was thought to be a slip and fall, but more information had surfaced, leading them to believe it may have been an assault on staff, and they were trying to gather facts to either support or refute that belief (T3-665).
KARL VIENNEAU
Officer Karl Vienneau, employed at Mid-State CF for approximately 23 years, testified [*30]that he was working as the housing unit officer for Unit 4H on July 6 (T3-699). He recalled the dorm frisk that took place that day. Officer Vienneau testified that he was assigned to the 4H housing unit during the raid and that he was in the bathroom when he heard the officers enter the dorm that morning (T3-699-700). During the raid, he was either in the officer's station or the dayroom area (T3-702-703), and he never walked down the hallway of Unit 4H (T3-703). Later in the day, he did eventually make it down the hallway (T3-703). As the housing officer for 4H, he would make rounds on a daily basis (T3-704). After the raid was over, he resumed his normal duties (T3-705).
Officer Vienneau testified that during the raid, he did not witness any uses of force, hear any racial slurs, or see any destruction of State or incarcerated individuals' property (T3-705). He described the dorm as messy after the raid and, upon conducting his rounds later, noticed damage (T3-706). He observed a few more holes in the dorm than were there before, and a couple of lockers were tipped over and in need of repair (T3-706).
When asked about fire extinguishers, Officer Vienneau testified that some of the fire extinguishers had dings on them (T3-710). He did not know how they got damaged but stated that he had never seen incarcerated individuals using fire extinguishers, nor did he witness staff using them to open lockers on July 6 (T3-711). Officer Vienneau was also questioned about previous testimony regarding the phones within the housing unit. He testified that he recalled the phones had been damaged and rendered inoperable but claimed not to know how they were damaged (T3-714). He further testified that, either on July 6 or shortly thereafter, he became aware that both of the TVs within the 4H housing unit were damaged and inoperable but did not recall what type of damage had been done (T3-715). He stated that he was informed by the incarcerated individuals about the phones being damaged and that the Superintendent had informed him that at least one or both of the TVs had been damaged (T3-715).
On cross-examination, Officer Vienneau was shown pictures of chairs sticking out of the walls but testified that he did not witness any officers throwing chairs into the walls (T3-722; Exhibit 6). Officer Vienneau testified that when he came on duty the morning of July 6, the phones and televisions in Unit 4H were intact. Sometime afterward, following the raid, he learned that they were no longer intact. He also testified that he never witnessed any incarcerated individuals cutting the cords (T3-731-732).
MICHAEL GAFFNEY
Officer Michael Gaffney, who works at Mid-State CF, was employed on July 6 and took part in the raid of the 4H dorm that day. He testified that while he was in the lineup room, he was not given any direction or instruction regarding the dorm frisk (T3-740). Officer Gaffney also testified that he was not given any information about the purpose or reason for the dorm frisk that day, but stated that "everybody knew" an officer had been assaulted on the unit a couple of days prior (T3-740-741).
That morning, Officer Gaffney entered the 4H dorm and testified that he personally searched approximately five of the incarcerated individuals' cubes (T3-742). He further testified that he did not witness any uses of force, did not damage any property, and did not witness any of his fellow staff members damaging property. He also did not hear any racial slurs or threats made against incarcerated individuals (T3-745-746). On cross-examination, Officer Gaffney testified that the officers gathered in the lineup room prior to going to the 4H dorm, and it was at that time he first learned about Officer Kahl's injury. However, he stated that learning about the injury did not make him angry (T3-768). It was also noted that many of the lockers Officer Gaffney searched were reported as damaged and in need of repairs after the raid (T3-768-770).
JAMES CROWE
Sgt. James Crowe, worked for DOCCS for approximately 23 ½ years and has since retired, testified that on July 6 he was working at Mid-State CF. Sgt. Crowe recalled being called to the 4H dorm that morning to escort an incarcerated individual named Mr. Bowers, who had been involved in a use of force incident (T3-790). Prior to this, he was not aware that Unit 4H was being searched that day (T3-791). When he arrived at Unit 4H to escort Mr. Bowers, Sgt. [*31]O'Neil and two other officers, Officers Joseph and Slawson, were present. Officers Slawson and Joseph accompanied him on the escort (T3-792). At some point, Sgt. Crowe was advised that Officers Slawson and Joseph had been involved in the use of force. He testified that it is not common practice to use officers involved in a use of force to escort an incarcerated individual after the fact (T3-793).
OSI INVESTIGATION (EXHIBIT 1)
The OSI investigation summary revealed that on July 3, 2016, CO Kahl was found to have sustained a head injury while on duty at Mid-State CF. A subsequent investigation by the DOCCS CIU concluded that two incarcerated individuals may have assaulted Officer Kahl, possibly using a weapon. In response to the CIU findings and in an effort to locate the alleged weapon, Superintendent Joseph Ward authorized a frisk of the 4H housing unit on July 6, 2016. That morning, approximately 30 COs, one lieutenant and one sergeant were assigned to conduct the search (Exhibit 1, p. 3).
During the frisk, staff reportedly caused significant damage to State property, incarcerated individuals' property, and the housing unit itself. This included damage to approximately 27 lockers requiring repair, as well as chairs and other items reportedly thrown against walls, causing further damage (id.).
Incarcerated individuals alleged that at around 8:00 a.m., approximately 30 officers entered the Unit 4H, tipping over lockers, throwing chairs, and dumping locker contents onto the floor. They further claimed that they were physically assaulted during the search. According to the summary, the resulting damage to the 4H unit exceeded $5,000, including repairs to lockers, walls, a television, and a telephone line, which needed to be reinstalled (id., p. 3, 7).
Although all staff members denied using excessive force, Capt. Adamik and Capt. Goppert both testified under oath that they observed a chair stuck in a wall, consistent with other reports of damage in the 4H unit. Sgt. O'Neil also testified under oath, stating that he observed a chair stuck in a wall and confirmed that there was no pre-existing wall damage prior to the frisk. He attributed the damage to staff assigned to the 4H housing unit. Capt. Adamik, Capt. Goppert and Sgt. O'Neil all testified that they took no action to investigate how the damage was caused (id. p. 7-8).
The summary further noted that the cable television line in the dayroom was severed, as was a second line on the porch, necessitating replacements. Superintendent Ward testified that he observed the cut cable lines during his rounds on or about July 7 and believed the damage was caused by staff (id., p. 8). Additionally, two fire extinguishers removed from the 4H unit and later recovered from the fire and safety building showed damage consistent with the use of extinguishers to break locker locks, as reported by incarcerated individuals (id.).
The summary also indicated that DSS Corey directed Capt. Adamik to ensure completion of the frisk. Capt. Adamik testified that the purpose of their frisk was in part to locate a weapon, but also "to send a message to the [incarcerated individuals] 'You will not harm staff' " (id., p. 9). Lt. Hebble testified that he had been ordered by Capt. Adamik to have 4H frisked, and that prior to the frisk he was instructed by the Superintendent and Deputy Superintendent of Security the frisk had two purposes: to locate the weapon allegedly used to assault Officer Kahl, but also "so [incarcerated individuals] know you don't touch staff" (id.).
Superintendent Ward observed the dorm post-frisk, describing it as "in disarray" with "lockers tipped over, beds tipped over, property all over the place". He added that, while he felt staff "went a little bit over the top", he did not consider it sufficient to warrant disciplinary action (id., p. 8).
One of the most telling accounts in the summary comes from DSP Joslyn, who testified that at approximately 10:32 a.m. on July 6, she entered the Unit 4H and described the scene as "a mess . . . everything was out of the lockers. There was jelly on the wall. It was chaos". She noted, "What I saw and what I thought the frisk was about didn't seem to match up. It seemed like an angry search . . . a message to the [incarcerated individuals] of control". She further stated, "There's a brotherhood and I think that's the message they said, you know, this is what happens [*32]when you hurt one of ours". DSP Joslyn concluded, "It was less about recovering, perhaps contraband . . . more about one of our brothers got hurt and we're going to show you who is in control" (id.).
Capt. Adamik stated that the purpose of the July 6 frisk was, in part, to locate the alleged weapon used in the assault on Officer Kahl. He further noted that the frisk aimed to send a clear message to the incarcerated individuals: "You will not harm staff". Capt. Adamik explained that this "different tone" for the frisk was relayed to Lt. Hebble and Sgt. O'Neil, who were assigned to supervise it. He also testified that during the frisk the Superintendent expressed that the conduct observed was in line with his expectations, "the way the frisk was conducted was what he expected and wanted", implying that the message of control was exactly what he intended to convey (id., p. 9). Capt. Adamik confirmed he was assigned to supervise the 4H housing unit frisk on July 6 and received instructions from the Superintendent and Lt. Suprenant regarding its purpose, which included locating "the alleged weapon used to assault Officer Kahl" (id., p. 9).
According to the summary of investigative findings, the investigation revealed insufficient evidence to corroborate the allegation that incarcerated individuals in the 4H unit were assaulted by staff during the frisk on July 6, 2016. However, the investigation found that facility supervisors failed to detect or report deficiencies and staff misconduct and that staff provided false or misleading testimony. The OSI summary further detailed that supervisory staff failed to properly oversee the frisk in Unit 4H, neglected their duties, and falsified paperwork related to the dorm frisk. As a result, several supervisory staff members faced consequences, including administrative leave, demotion, issuance of a notice of discipline, or requirements to undergo retraining (id., p. 1-3, 10).
LAW AND ANALYSIS
PROPERTY DAMAGE
Claimants bring a cause of action for destruction of personal property, in that in the course of the dorm frisk and weapon search lockers were tipped over, personal property was emptied onto the floor and onto incarcerated individuals. At oral argument claimants' counsel conceded there was a lack of evidence regarding the loss of personal property as a bailment. Instead, claimants' counsel argued that the property destruction resulted in pain and suffering to the claimants which therefore would not require exhaustion of administrative remedies. Defendant notes that not all claimants filed a property claim if they were making a claim for reimbursement for damaged property. Defendant also noted that of those few claimants that did file a claim, there was a failure to exhaust their administrative remedies. Therefore, defendant maintained its position that claimants' property claims should be dismissed.
Claims for damage to an incarcerated individual's personal property is governed by Court of Claims Act § 10 (9). It provides that a claim of an incarcerated person "in the custody of [DOCCS] for recovery of damages for injury to or loss of personal property may not be filed unless and until the [incarcerated person] has exhausted the personal property claims administrative remedy, established" by DOCCS. The administrative remedies established by DOCCS for personal property claims consist of a two-tier system, including an initial review and an appeal (7 NYCRR § 1700.3). The failure to exhaust the administrative remedies prior to serving and filing a claim in the Court of Claims deprives this Court of subject matter jurisdiction and requires the dismissal of the claim (Williams v State of New York, 38 AD3d 646, 647 [2nd Dept 2007]). There was only very general testimony by the claimants as to what property was destroyed, and there was no testimony that claimants exhausted administrative remedies. Therefore, for all the above reasons, the Court dismisses claimants' causes of action for property damage.
DELAY OF MEDICAL TREATMENT
With regard to the claim for denial of medical care, the Court notes that in claimants' post-trial brief, as well as at oral argument thereafter, claimants concede there was insufficient evidence as to the cause of action for denial of medical care. Defendant repeatedly argues that there is evidence of medical treatment being provided to some of the claimants the day of the [*33]incident, and to others shortly thereafter. Additionally, defendant argues that despite allegations of violent assaults, claimants did not suffer injuries requiring treatment. In any event, the Court dismisses the causes of action for denial of medical care due to claimants' withdrawal.
VERBAL AND PHYSICAL THREATS, HARASSMENT, AND INTIMIDATION
Similarly, as to the causes of action for verbal and physical threats, harassment, and intimidation, claimants have withdrawn these claims. Claimants posit that these alleged acts would be within the cause of action for assault and battery. Defendant is silent on this issue. Therefore the Court dismisses the causes of action for verbal and physical threats, harassment, and intimidation.
FAILURE TO INTERVENE
Next, claimants allege causes of action for failure to intervene, in that there were supervisors present during the dorm frisk, observing the actions of the officers, and they took no action to prevent harm to claimants. The elements of a cause of action for failure to intervene are: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene" (Jean-Laurent v Wilkinson, 540 F Supp 2d 501, 512 [SDNY 2008], affd 461 F Appx 18 [2d Cir 2012] [citations omitted]). Based on these elements, it appears that the causes of action asserted by claimants for failure to intervene is a constitutional tort claim that is not viable in the Court of Claims (see also Buari v City of New York, 530 F Supp 3d 356, 392 [SDNY 2021]["there can be no failure to intervene claim without a primary constitutional violation" (quoting Sanabria v Tezlof, 2016 WL 4371750 *5 [SDNY, Aug. 12, 2016])]).
"[C]laims for damages against the State based on alleged deprivations of rights under the US Constitution are beyond the jurisdiction of the Court of Claims" (Shelton v New York State Liq. Auth., 61 AD3d 1145, 1151 [3d Dept 2009][citations omitted]; see also Brown v State of New York, 89 NY2d 172, 185 [1996] [citations omitted] [the State is not a "person" subject to a lawsuit pursuant to 42 USC 1983, which is the statute authorizing private parties to enforce their federal constitutional rights via lawsuits]). "Assuming arguendo that a parallel state constitutional claim could be recognized, a state constitutional claim is precluded due to the availability of alternative remedies, including an action pursuant to 42 USC 1983 in federal court and common law tort claims" (McFarland v State of New York, UID No. 2024-066-544 [Ct Cl, Haak, J., July 15, 2024][citations omitted]; see also Williams v State of New York, 137 AD3d 1579, 1580 [4th Dept 2016], appeal dismissed 28 NY3d 958 [2016]; Shelton, 61 AD3d at 1150; Waxter v State of New York, 33 AD3d 1180, 1181-1182 [3d Dept 2006]["a private right of action for a violation of the NY Constitution is unavailable where an alternative remedy. . . exists"]). Therefore, to the extent the claim alleges failure to intervene, those causes of action are dismissed, as the claim fails to state a cause of action for which relief can be granted in the Court of Claims.
NEGLIGENT HIRING, TRAINING, AND RETENTION
In claimants' post-trial brief, as well as at oral argument thereafter, claimants withdrew their claims for negligent hiring, training, and retention. Claimants state that there was insufficient evidence adduced at trial on this issue, and also that the claims are not viable in light of their position that all of the actions of defendant's employees were undertaken within the course and scope of their employment. Therefore, claimants' cause of action for negligent hiring, training, and retention is dismissed.
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
The claims for intentional infliction of emotional distress were previously dismissed in the Collins Decision, in view of the public policy prohibiting such claims (Aliaga v State of New York, UID No. 2021-015-101, [citing Ross v State Univ. of NY, 166 AD3d 1034 (2d Dept 2018); Sawitsky v State of New York, 146 AD3d 914, 915 (2d Dept 2017), lv denied 29 NY3d 908 (2017); Peterec v State of New York, 124 AD3d 858, 859 (2d Dept 2015); Tatta v State of New York, 51 AD3d 1295 (3d Dept 2008), lv denied 11 NY3d 703 (2008)]).
ASSAULT / BATTERY
The claim sets forth a cause of action for assault and battery and alleges the use of excessive force by the involved officers. In a prison or CF, it is recognized that the use of force is specifically permitted under certain circumstances, including "self-defense, or to suppress a revolt or insurrection [and] . . . to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape" (Correction Law § 137 [5]). It is also set forth in 7 NYCRR 251-1.2 (b), that "[w]here it is necessary to use physical force, only such degree of force as is reasonably required shall be used," and at 7 NYCRR 251-1.2 (d) that an officer "shall not lay hands on or strike an [incarcerated individual] unless the employee reasonably believes that the physical force to be used is reasonably necessary: for self-defense; to prevent injury to person or property; to enforce compliance with a lawful direction; to quell a disturbance; or to prevent an escape". In order to assess what degree of force was necessary at the time of the incident, this Court has to consider the particular circumstances that confronted the CO at the time that the force was applied (Bush v State of New York, 57 AD3d 1066 [3d Dept 2008]; Koeiman v City of New York, 36 AD3d 451 [1st Dept 2007], lv denied 8 NY3d 814 [2007]). The Court must consider whether such use of force was reasonable under the circumstances. Excessive force cases are highly fact-specific, and hinge heavily on credibility determinations (see e.g. McDonald v State of New York, UID No. 2011-041-505 [Ct Cl, Milano, J., May 3, 2011]; Merced v State of New York, UID No. 2010-015-513 [Ct Cl, Collins J., Sept. 17, 2010]). An important part of assessing credibility is "observing the behavior and demeanor of witnesses as they testify" (Zeleke v State of New York, UID No. 2010-030-017 [Ct Cl, Scuccimarra J., June 3, 2010]).
The State is not immune from liability for an assault and battery when an officer, acting within the scope of employment, uses more force than is necessary to perform his or her duty (Arteaga v State of New York, 72 NY2d 212, 220-221 [1988]; Barnes v State of New York, 89 AD3d 1382 [4th Dept 2011]). "Under the doctrine of respondeat superior, an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment" (N.X. v Cabrini Med. Ctr., 97 NY2d 247, 251 [2002]). Whether the conduct is negligent or intentional is not the determining factor. Rather, "the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment" (Judith M. v Sisters of Charity Hosp., 93 NY2d 932, 933 [1999]). The test is not whether the employee was acting in an authorized manner but "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions" (Riviello v Waldron, 47 NY2d 297, 302 [1979] [inner quotation marks and citation omitted]; see also McMindes v Jones, 41 AD3d 1196 [4th Dept 2007]; Cepeda v Coughlin, 128 AD2d 995 [3d Dept 1987], appeal denied 70 NY2d 602 [1987]). Thus, an employer who places an employee in a position of trust or responsibility is responsible when the employee "through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another" (Sims v Bergamo, 3 NY2d 531, 535 [1957][inner quotation marks and citations omitted]). The employer need not foresee the precise manner in which an injury occurs "so long as 'the general type of conduct may have been reasonably expected' " (Stewart v Westchester Inst. for Human Dev., 136 AD3d 1014, 1018 [2d Dept 2016], quoting Riviello, 47 NY2d at 304). Conduct undertaken for purely personal reasons unrelated to an employee's job, falls outside the scope of employment (see Rivera v State of New York, 34 NY3d 383, 390 [2019]; N.X. v Cabrini Med. Ctr., 97 NY2d 247).
[New York Courts] have long recognized that, in cases involving a use of force, whether an employee is acting within the scope of employment requires consideration of whether the employee was authorized to use force to effectuate the goals and duties of the employment (see Sauter v New York Tribune, Inc., 305 NY 442, 445 [1953]). In some cases, particularly those involving occupations for which some physical contact with [*34]others is permissible or even expected, it may be difficult to determine whether a challenged action falls far enough outside the boundaries attendant to the employment relationship such that the employee should be solely liable for their respective tortious conduct.
(Rivera, 34 NY3d at 390).
As the Court of Appeals has stated, "[COs] at times use excessive force. Such conduct will not fall outside the scope of employment merely because it violates department rules or policies or crosses the line of sanctioned conduct (Rivera, 34 NY3d at 391; see also Harriger v State of New York, 207 AD3d 1045 [4th Dept 2022]). Whether a particular act was within the scope of employment is "heavily dependent on factual considerations" (Riviello, 47 NY2d at 303; see also Holland v City of Poughkeepsie, 90 AD3d 841, 844 [2d Dept 2011]; Graham v City of New York, 2 AD3d 678, 679-680 [2d Dept 2003]). The factors to be considered include "the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated" (Riviello, 47 NY2d at 303). Even intentional torts may still fall within the scope of employment, and the motivation for such conduct is not dispositive as to defendant's liability; rather, that factor is but one of several for consideration pertaining to whether such acts were foreseeable as "a natural incident of the employment" (Rivera, 34 NY3d at 389 [internal quotation marks and citation omitted]; see Riviello, 47 NY2d at 304). Said differently, "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment" (Riviello, 47 NY2d at 304; see also Galloway v State of New York, 212 AD3d 965, 966 [3d Dept 2023]).
Galloway is instructive in this instance. Galloway involved a use of force by a CO during the course of a pat frisk, when the CO then punched claimant in the face. The Appellate Division held that while the force employed by the CO " 'crossed the line of sanctioned conduct' it cannot be readily divorced from the pat frisk and ensuing efforts to subdue claimant so as to render it outside the scope of employment" (Galloway, 212 AD3d at 968 [citations omitted]). Additionally, in Galloway a subsequent investigation "effectively condoned the conduct of the [COs] and tacitly found them to be engaged in actions that were within the scope of employment" (id.). In their investigation, the CF officials determined that the COs' conduct was "appropriate under the circumstances and fell within the scope of employment" (id.). Critically, there was a history between this claimant and the CO. The pat frisk and assault of claimant took place after claimant lodged a complaint under the Prison Rape Elimination Act (34 USC § 30301-09) accusing the CO of inappropriate contact with him, of which the CO and his supervisor both had knowledge. In the context of those events preceding the pat frisk and assault of claimant, the Appellate Division found that "it was clearly foreseeable that a tense encounter could result during further interactions between the [CO] and claimant in the context of normal employment-related activities in the [CF]" (id., [citations omitted]).
However, the Courts have been clear that where a claimant's allegations are of sexual abuse or sexual assault there is a clear departure from the employee's duties for solely personal motives unrelated to furtherance of the employer's business (Judith M. v Sisters of Charity Hosp., 93 NY2d 932, 933 [1999]; M.K. v State of New York, 216 AD3d 139 [3d Dept 2023]).
In M.K. v State of New York, an incarcerated individual was subjected to a strip frisk, wherein he was ordered to alternate between putting his fingers in his mouth and on or in his genitalia repeatedly. The M.K. Court found "that the underlying conduct . . . readily differs from those concerning sexual assault, which would not be permitted conduct under any instance and, thus, would constitute 'a clear departure from the scope of employment' " (M.K. v State of New York, 216 AD3d at 144 [internal citations omitted]). The Court focused on the officers' motivation which was "clearly a despicable and perverse undertaking of the allowable procedures. . . not undertaken solely to humiliate claimant and, therefore, was part and parcel of [*35]the employment-related function of administering a strip frisk" (id.). Therefore, the Court found defendant liable in M.K., applying principles concerning use of excessive force in that the officers' actions "clearly crossed the line of sanctioned conduct, [but] cannot be readily divorced from the authorized [acts]" (id., [internal quotation marks omitted], citing Galloway v State of New York, 212 AD3d at 968).
In the Collins Decision, the Court found that the first three Riviello factors (time, place, and occurrence of the act) were easily satisfied, as the alleged assaults occurred at the CF during a unit frisk conducted to search for a weapon believed to have been used in an assault on an officer (Aliaga v State of New York, UID No. 2021-015-101). Additionally, in the Collins Decision the Court noted that the claimants had established, through documentary evidence, that the use of force was authorized by the CF's executive team to "send a message" and to protect the "brotherhood" of the officers. Thus, the claimants demonstrated that the raid was authorized and conducted within the regular scope of the defendant's business. However, in analyzing the remaining factors, the Collins Decision found factual questions regarding whether the acts could have reasonably been anticipated and controlled by the employer, either directly or indirectly. Furthermore, whether the specific conduct alleged by each of the 33 claimants was so extreme as to constitute a departure from authorized actions could not be determined as a matter of law at that stage.
DECISION
After listening to and observing the demeanor of the witnesses as they testified, and upon consideration of their testimony, all the other evidence received at trial, the applicable law, and the parties' post-trial submissions, the Court makes the following findings:
On July 6, 2016, numerous COs and supervisors conducted an extensive raid of the 4H Housing Unit at Mid-State CF. The raid was authorized by Mid-State supervisory staff, including the facility's superintendent. The raid had a dual purpose: first, to locate a weapon believed to have been used by an incarcerated individual or individuals in an assault on Officer Kahl three days earlier, and second, to send a message to those in the housing unit that further assaults on officers would not be tolerated. This purpose was conveyed by the Superintendent and supervisory staff to most of the officers involved in the search. The testimony made clear that the raid was condoned and overseen by supervisory staff at Mid-State, including those holding ranks of sergeant, lieutenant, captain, and superintendent. During the raid, officers used excessive force against incarcerated individuals in the unit.
Excessive force was used specifically against 28 claimants in the unit including claimants Pablo Dones, Ezequiel Martinez, Cole Bryant, Ricardo Moore, Keith Gates, Mark Canada, Carl Champagne, Matthew Petrillo, Lenard Cox, Jeremiah Williams, Jace Davis, Brian Kelly, Kyle Finch, Israel Miranda, Tony King, Michael Russell, Ralph White, Shabar Chambers, Alec Hammond, Roy Bowers, Matthew Aliaga, Kyle Loucks, Solomon Hall, Gregory Pearsall, Luis Robles, J.D., N.F., and R.B.. The excessive force used against all 28 claimants occurred during the authorized raid of the housing unit and was motivated largely, if not entirely, by a desire to send a message that assaults on COs would not be tolerated by Mid-State staff.
Based upon a preponderance of the evidence, this Court concludes on July 6, 2016, officers at Mid-State committed assaults and batteries against claimants Pablo Dones, Ezequiel Martinez, Cole Bryant, Ricardo Moore, Keith Gates, Mark Canada, Carl Champagne, Matthew Petrillo, Lenard Cox, Jeremiah Williams, Jace Davis, Brian Kelly, Kyle Finch, Israel Miranda, Tony King, Michael Russell, Ralph White, Shabar Chambers, Alec Hammond, Roy Bowers, Matthew Aliaga, Kyle Loucks, Solomon Hall, Gregory Pearsall, Luis Robles, J.D., N.F., and R.B.. The above actions of the COs were undertaken within their scope of employment; therefore, the State of New York, under the doctrine of respondeat superior, is 100% vicariously liable for all assaults and batteries committed against the above-named claimants.
In the Court's view, the physical abuse inflicted on these claimants by the officers was not carried out for purely personal reasons disconnected from their roles or the business of their employer. Rather, it was a modern-day "salting the earth" intended not only to have an [*36]immediate impact but to communicate a message to the claimants with lasting consequences. This message was meant to deter similar purported assaults by other incarcerated individuals against staff at the facility.
In such cases, determining whether the use of force against claimants in a CF hinges on the Court's assessment of witness credibility and the degree to which other evidence supports that credibility assessment. The Court was struck by the consistency among the testimonies of all 28 claimants. While it appeared that some claimants may have embellished certain details, such as the extent of their injuries or the precise number of blows received, the Court ultimately finds their testimony to be credible overall. Many claimants became visibly emotional while recounting what was clearly a traumatic experience, underscoring the gravity of the events described.
Additionally, numerous claimants were able to corroborate each others accounts, enhancing the reliability of their testimonies. Given the length of this trial, the number of claimants involved and the logistical challenges claimants' counsel faced in locating and presenting each witness - many of whom had since been released from State custody - the Court did not sense that claimants had been overly prepared or coordinated their stories in advance of their trial testimony.
The claimants, by and large, consistently described how officers stormed the dorm that morning, indiscriminately kicking, punching, stomping, or slamming them one by one as they proceeded through the dorm. As detailed above, several claimants were able to corroborate each others accounts, sometimes with significant detail. For example, Mr. Hammond described being kicked in the mouth "like a football punt," a claim corroborated by Mr. Cox, who similarly described Mr. Hammond being kicked "like a freaking football". Likewise, Mr. J.D. recounted an encounter in which an officer used him "like a trampoline", which was confirmed by Mr. Gates, who testified to seeing officers "using Mr. J.D. as a trampoline".
Furthermore, claimants testified that they were instructed to lie on the floor in a prone position - a point confirmed by several officers who admitted it was unusual to see incarcerated individuals lying on the floor during a dorm search. Although the officers struggled to offer a logical reason for this, the Court finds it was likely in response to orders meant to prevent the claimants from seeing the officers' faces as they stormed the dorm. Additionally, claimants testified that officers had either covered or removed their name tags, a point corroborated by Mr. Oliver's testimony.
It is also evident from the testimony of both claimants and officers that supervisors, including the Superintendent and senior staff, were present at various points during the raid, observing the damage to the dorm and appearing pleased with the result. Claimants recounted how officers destroyed State property and anything in their path, including throwing chairs into walls, tipping over lockers, and tossing beds. The Court takes particular note of the reports of chairs being thrown into and left sticking out of walls, a detail confirmed by Mr. Oliver's investigation, and the State has offered no reasonable explanation for this damage. The point of chairs being embedded in the walls was corroborated by multiple witnesses, and the Court finds it difficult to imagine a justification for officers throwing chairs into walls other than as a clear indication that they crossed the line. Despite staff members' general denials of excessive force, both Capt. Adamik and Capt. Goppert testified under oath that they observed a chair lodged in a wall, consistent with other reported damage in the Unit 4H. Mr. O'Neil also testified under oath that he observed a chair stuck in the wall, confirmed there had been no prior wall damage, and attributed the damage to staff involved in the Unit 4H search.
Moreover, the State fails to provide any justification for why the cords to the TVs and telephones in the dorm were cut. This supports the Court's belief that the damage was consistent with threats allegedly made by Sgt. O'Neil that claimants were not to contact anyone to report the assault afterward. Officer Vienneau, one of the 4H housing officers, testified that the TVs and phones were functional before the raid, and it stands to reason, in the Court's view, that claimants did not disable their only sources of entertainment and communication with the outside world in [*37]the 4H dorm.
Defense counsel makes their best effort to highlight inconsistencies and the lack of corroborating medical evidence or medical treatment. While the Court acknowledges some variations in the claimants' accounts, it finds that many of these inconsistencies have reasonable explanations and are outweighed by the overall evidence supporting their claims. For starters, this trial was conducted seven years after the incident giving rise to the claim, which, in the Court's view, naturally accounts for some of the inconsistencies in the claimants' testimonies and memory lapses regarding specific details.
The defense emphasizes the absence of documented injuries or medical treatment. Although the Court agrees that some claimants likely overstated the number of kicks, punches, and other assaults they endured, this does not mean they were dishonest about the events themselves. There are numerous plausible reasons for the lack of medical records, including that claimants were reportedly threatened by staff against seeking medical care. Moreover, the record indicates that several claimants did, in fact, seek medical attention after the incident. The Court also notes that in correctional settings, many incarcerated individuals regularly access medical care for routine medication or ongoing treatment, making the absence of distinct injury records less significant.
The defense further points to the OSI investigation's lack of substantiated findings. Specifically, Mr. Oliver and his team were unable to substantiate the claimants' allegations of excessive force. However, the Court is mindful—based on Mr. Oliver's own testimony—that the investigation was hindered by the fact that OSI was not made aware of the raid and could not begin investigation until nearly a month after the incident. This delay prevented Mr. Oliver and his team from promptly interviewing claimants, conducting body scans for visible injuries such as bruising, taking contemporaneous photos of the dorm, and interviewing staff while events were still fresh. Furthermore, as Mr. Oliver admitted, unlike the Court, which had the benefit of observing each claimant's live testimony, he did not personally observe claimants as they made their statements to his investigators, thus missing the opportunity to assess their credibility through demeanor and body language.
It is also significant to the Court that Superintendent Ward did not mention the July 6 raid during a meeting with OSI investigators on July 8, where they discussed findings from the July 3 incident. Additionally, as Mr. Oliver noted, several Unit 4H residents reportedly passed polygraphs, supporting his view that they did not assault Officer Kahl, which the Court finds further bolsters their credibility.
As for the officers, they uniformly claimed that nothing was amiss with the dorm search, and, in a display of remarkable unanimity, the State officials who testified about witnessing, participating in, or supervising the search maintained that no excessive force was used against any incarcerated individuals, nor were any threats or racial slurs made. Nevertheless, regarding the issue of scope of employment, the State's witnesses consistently asserted that the execution of the dorm search was in line with what they understood to be its purpose and that it was conducted similarly to prior dorm searches.
Mr. O'Neil characterized the search as being conducted in the regular course of his duties, stating that there was nothing unusual about the search's manner and that all officers were simply doing their jobs and following supervisory instructions. Lt. Ronald Hebble echoed this sentiment, testifying that tipping over lockers was standard protocol during a search, that finding liquid on the floor was not unusual, and that taking urine samples from incarcerated individuals was a routine part of dorm searches.
Other officers, including CO Christopher Hayes, CO Christopher Herring, CO Vincent Sullivan, CO Kenneth Shortt, and CO Michael Gaffney, all testified that the procedures followed that day were consistent with normal protocol, with nothing about the search deviating from other dorm searches they had conducted. Lt. Hebble further testified that senior staff, or "brass", observed the search and raised no concerns, affirming that they "had no problem with what had happened". In fact, when Lt. Hebble encountered the Superintendent in the housing unit during [*38]the search, the Superintendent reportedly told him, "Good job". Given all of this, the Court finds although the officers crossed the line of sanctioned conduct, their actions cannot be readily divorced from the dorm search efforts to find a weapon allegedly used to assault one of the officers so as to render it outside the scope of employment (see Galloway, 212 AD3d at 968).
Officer Sullivan, the bus driver on the morning of the July 6 raid, provided unusually candid testimony about the mood of the officers prior to the search. While most of the State's witnesses downplayed the assault on Officer Kahl three days earlier, suggesting it had minimal impact on their emotions, Officer Sullivan openly described the heightened tension among officers that morning. He testified, "I heard people talking", when asked if he heard others discussing what had happened to Officer Kahl. Initially, he distanced himself from these conversations, but then clarified that he overheard other officers discussing the incident, although he claimed he did not fully know what was being said. When asked if Officer Kahl's injury was a topic of conversation among officers at the lineup, including those preparing to conduct the frisk, he replied, "Probably, for most people".
Officer Sullivan further explained that the officers were discussing the injury because it was the first time many had gathered after the July 4th holiday. He confirmed that they were talking about how Officer Kahl had been cut by an incarcerated individual. In a further exchange about the mood, he acknowledged that this information "made them pretty angry". When asked about specific individuals, Officer Sullivan confirmed that Sgt. O'Neil was particularly "upset". Pressed further by the Court on his impressions, Officer Sullivan noted, "I believe everybody was very upset". He also acknowledged his own anger, confirming that the overall mood was tense and emotional leading up to the dorm search. In light of the alleged assault on Officer Kahl on July 3, the staff's knowledge and anger of same, the Court finds it was clearly foreseeable to supervisors that a tense encounter would result during the raid (see Galloway, 212 AD3d at 968-969).
Next the Court will address the particular alleged contact during the unit frisk of the private parts of three claimants, Mr. J.D., Mr. R.B. and Mr. N.F., and consider if they were sexual assaults. If they were not sexual assaults, and defendant's employees were acting within the scope of employment at the time of those particular assaults, the State might be held vicariously liable. As previously discussed, in addition to the above referenced punches, kicks and stomps, it is alleged that Mr. J.D., Mr. R.B. and Mr. N.F. were subjected to assaults involving their genital or rectal anatomy. Specifically, it is alleged that when Mr. J.D. was required to provide urine for urinalysis Officer O'Neil, in an effort to get him to urinate, flicked Mr. J.D.'s penis 3-4 times with his finger while stating "we just need a few drops" (T3-34). As to Mr. R.B. and Mr. N.F., it is alleged that while multiple COs were present, their pants came down, objects were inserted in their anus or rectum, and statements were made to them asking them "how does it feel to be helpless, like my officer was helpless" (T1-304; T2-162-164; Exhibit 85, p. 24). This was an apparent reference to the assault on Officer Kahl. Or, the COs stated "where is it at?" to Mr. N.F., a question apparently attempting to locate a weapon (T2-161-162).
In the prior motion Decision and Order in this claim, Judge Collins stated the following:
To the extent three of the claimants allege they were sexually assaulted, the Court concludes as a matter of law that the assaults were not committed within the scope of the correction officers' employment. Sexual assaults are considered a departure from duties for "wholly personal motives", not conduct committed in furtherance of an employer's business (see N.X. v Cabrini Med. Ctr., 97 NY2d at 251). Even where a sexual assault occurs during the course of an employee's assigned duties, e.g., while bathing a hospital patient, it has been held to be a clear departure from the scope of employment for solely personal motives unrelated to furtherance of the employer's business (see Judith M. v Sisters of Charity Hosp., 93 NY2d 932; Doe v Heckroth Plumbing & Heating of Woodstock, Inc., 192 AD3d 1236 [2021]; Montalvo v Episcopal Health Servs., Inc., 172 AD3d 1357 [2d Dept 2019]; Osvaldo D. v Rector Church Wardens & Vestrymen of Parish of Trinity Church of NY, 38 AD3d 480 [1st Dept 2007]; Bowman v State of New [*39]York, 10 AD3d 315 [1st Dept 2004]; Steinborn v Himmel, 9 AD3d 531 [3d Dept 2004]). Inasmuch as sexual assaults are committed for wholly personal motives, the sexual assaults that allegedly occurred here were a clear departure from the officers' scope of employment. Accordingly, to the extent the causes of action asserted by these claimants are premised upon sexual assaults, they are dismissed.
(Aliaga v State of New York, UID No. 2021-015-101 [Ct Cl, Collins, J., Nov. 8, 2021]).
Claimants argue that the Collins Decision did not find that the acts related to these three claimants were sexual acts, and did not identify the specific acts or address the circumstances of the acts, but instead left this fact based issue to be determined by the trial court. Use of the conditional language "to the extent the causes of action asserted by these claimants are premised upon sexual assaults, they are dismissed" leaves this Court to determine to what, if any, extent those causes of action are premised on sexual assaults (id. [emphasis added]). According to claimants, these particular assaults involved parts of Mr. J.D., Mr. R.B. and Mr. N.F.'s bodies that are commonly identified as private parts, and in most circumstances those assaults would be identified as sexual assaults, yet here they should not be considered sexual assaults. Claimants' counsel relies heavily upon the Third Department's decision in M.K. v State of New York, 216 AD3d 139 (3d Dept 2023), in arguing that the assaults of Mr. J.D., Mr. R.B. and Mr. N.F. were not sexual assaults, but a part of the dorm frisk. The dorm frisk was authorized and directed by supervisors at the CF in order to locate the weapon allegedly used in the assault of a CO and dissuade the incarcerated individuals from further attacks on staff, therefore the defendant should be held liable for these assaults, as well as any other assaults.
In opposition, defendant argues that these particular assaults of Mr. J.D., Mr. R.B. and Mr. N.F. are clearly sexual assaults and must not be considered by the Court as they are so divorced from the scope of employment that they should not be considered viable causes of action. Sexual assaults are committed solely for personal reasons, and unrelated to the furtherance of the employer's business. Defendant points to the well established rule discussed in Rivera v State of New York, 34 NY3d 383 (2019), which was a claim alleging use of force by a CO against an incarcerated individual, as to whether an employee acted within the scope of employment. They emphasize that vicarious liability can only attach if the employee's tortious conduct is generally foreseeable and a natural incident of the employment, but is outside the scope of employment if "gratuitous and utterly unauthorized", showing a significant departure from normal methods and practices (id. at 391). In Rivera, the Court of Appeals found that "the gratuitous and utterly unauthorized use of force was so egregious as to constitute a significant departure from the normal methods of performance of the duties of a correction officer as a matter of law. This was a malicious attack completely divorced from the employer's interests" (id.). However, in Rivera the Court of Appeals also noted that there was no evidence that defendant "should - or could - have reasonably anticipated such a flagrant and unjustified use of force" (id.). Defendant acknowledges M.K. v State of New York, but draws a contrast with the present allegations, in that here there was no strip frisk regulated by a DOCCS Directive with explicit directions as to how an incarcerated individual is to remove all clothes then "lift his testicles to expose the area behind his testicles, and bend over and spread his buttocks to expose his anus" (Defendant's brief p. 45, quoting M.K. 216 AD3d at 143). Defendant also notes that in M.K. no sexual assault was alleged. Finally, defendant argues there must be some sort of notice or prior knowledge of an employee's proclivity to engage in "sexual assault, or using sexual assault as punishment" in order to find defendant liable (Defendant's brief p. 46).
Here, as to Mr. J.D., Mr. R.B. and Mr. N.F.'s causes of action, there can be little dispute that the employee-employer relationship, time, place and manner and the common nature of search and dorm frisk, are established by the record.
As to the assault of Mr. J.D., wherein his penis was flicked several times by Officer O'Neil in the course of obtaining a urine sample for urinalysis, the Court finds by a preponderance of the evidence that this act was not a sexual assault and it did not significantly deviate from the duties to be performed by the officers in obtaining a urine sample and was [*40]foreseeable in the context of the dorm frisk authorized in this instance. Similar to the Directive at issue in M.K. regarding how to conduct a strip frisk, here Directive 4937 specifies urinalysis test procedures, including how the cup is to be handled, and who may witness the incarcerated individual urinating (Exhibit 87). Officer O'Neil testified that he took no sexual gratification from male genitalia. This action, as inappropriate as the flicking of Mr. J.D.'s penis by Officer O'Neil may be, was clearly in furtherance of the employer's interests in obtaining a urine sample. Therefore the defendant will be held vicariously liable for the additional assault of Mr. J.D., wherein Officer O'Neil flicked his penis multiple times.
As to the assaults of Mr. R.B. and Mr. N.F., the Court is presented with a different question. Was the act of inserting an unknown item in their respective anus or rectum a sexual assault that clearly crossed the line of sanctioned conduct and in no way can be part of or an extension of the dorm frisk? If so, the State cannot be held vicariously liable for its employees' tortious act, which would be considered a sexual assault and therefore is outside the scope of employment. Or, in the alternative, were these actions foreseeable and done in furtherance of the defendant's objectives?
The Court finds that the contact by COs with Mr. R.B.'s and Mr. N.F.'s rectal area is not analogous to cases where sexual assaults are deemed intentional torts perpetrated solely for an employee's personal motives, which would typically exempt an employer from liability under the doctrine of respondeat superior. Instead, the Court finds that the act of inserting an object into the rectums of Mr. R.B. and Mr. N.F. was not carried out for the COs' personal reasons, disconnected from their employer's interests. Rather, these actions were executed for penological purposes, intended to convey a message from the Superintendent and supervisory staff that assaults on correctional staff would not be tolerated at Mid-State CF.
These acts were taken in the midst of approximately 30 COs acting in concert against 28 incarcerated individuals, in the dormitory space, in the course of knocking over furniture, dumping personal items on incarcerated individuals, speaking vulgarities, ordering that incarcerated individuals remain prone on the floor, assaulting them by kicking, hitting, stomping and making statements meant to elicit a feeling of helplessness. As Brian Kelly testified, it was a flight or fight scenario and the incarcerated individuals could do neither (T1-799).
Lt. Hebble, when questioned by OSI, said he was instructed by the Superintendent and Deputy Superintendent of Security to make it clear to the 4H residents "you don't touch staff". One of the frankest accounts in the OSI report comes from DSP Joslyn, who testified that upon entering the 4H unit following the raid, she found the area in complete disarray, with belongings scattered, jelly on the wall, and a chaotic atmosphere. DSP Joslyn observed that "what [she] thought the frisk was about didn't seem to match up", describing it as "an angry search" meant to "send a message of control" to the incarcerated individuals. She noted a sense of "brotherhood" among the officers, suggesting that the raid was intended to convey, "this is what happens when you hurt one of ours". DSP Joslyn concluded that the search appeared motivated less by contraband recovery than by a desire to reassert control after the injury to a fellow officer. Since the nature and scope of the search were authorized and directed by the administration at Mid-State, its execution was far from a covert operation by a few rogue officers in an isolated area of the prison. Instead, the credible testimony overwhelmingly demonstrated that the search unfolded as a loud, violent sweep through an open dormitory, involving numerous COs and supervisors who not only assaulted and battered every incarcerated individual they encountered but also issued threats and racial slurs throughout the raid.
The Court concludes the use of force by inserting an object into the rectum or anus of Mr. R.B. and Mr. N.F. was employed with the objective of maintaining order and discipline in the 4H dorm on July 6, and further to convey to its residents a message that physical force would be used in the future to ensure order and discipline. The COs were not acting for wholly personal reasons; therefore, the defendant will be held liable for the additional assaults on Mr. R.B. and Mr. N.F..
Any assertion or testimony that this was an "angry search," overboard, or that officers were upset prior to the raid due to the alleged assault on their fellow officer does not negate the [*41]finding that the raid was authorized and conducted within the regular scope of business. The evidence established that the operation was condoned by the highest levels of prison administration.
Given the foregoing, the Court finds that claimants have proven their claim by a preponderance of the credible evidence, that there was no justification for the excessive and unreasonable use of force against the claimants on the date in question, and assigns 100% culpability for the acts and omissions of its employees and claimants' resultant injuries to defendant. The Court also finds that claimants have proven that the additional assaults of Mr. J.D., Mr. R.B. and Mr. N.F. were not sexual assaults and were proven by a preponderance of the credible evidence. Therefore, defendant will be held 100% liable for these additional assaults of Mr. J.D., Mr. R.B. and Mr. N.F. 
Any motions not previously decided are hereby denied.
Let interlocutory judgment be entered accordingly.
A trial on the matter of damages will be scheduled by the Court. The parties are encouraged to consider alternative dispute resolution for the ascertainment of damages.

Footnotes

Footnote 1: Throughout this decision, the term "raid" may also be referred to as "dorm frisk" or "dorm search"; all terms refer to the incident of July 6, 2016.

Footnote 2: Three transcripts contain the testimony of the eleven days of trial testimony. They will be referred to as follows: "T1" containing testimony from June 26-30, 2023; "T2" containing testimony from July 5-6, 2023; and "T3" containing testimony from August 24-25 and 28-29, 2023. Citations will follow the following format: "T#-p. #", for example "T1-47".

Footnote 3: As previously noted, Exhibit 88 was admitted, with redactions, under a sealing order.